[Civ. No. 44149. Second Dist., Div. Five. Apr. 28, 1975.]

BERNARD CASTALINE et al., Plaintiffs and Appellants, v.
CITY OF LOS ANGELES, Defendant and Appellant.

## COUNSEL

Pizante & Gregg and Ronald E. Gregg for Plaintiffs and Appellants.

Burt Pines, City Attorney, John T. Neville, Assistant City Attorney, Raymond P. Bender and Arthur D. Rutledge, Deputy City Attorneys, for Defendant and Appellant.

## OPINION

KAUS, P. J.—Both defendant City of Los Angeles (City) and plaintiffs Bernard and Marilyn Castaline appeal from a judgment in plaintiffs' favor. Trial was by jury.

### FACTS

The basic facts in this chain-reaction automobile collision incident are undisputed. On July 21, 1969, a Monday, at about 6:30 a.m., plaintiffs were driving in the northbound number two lane of the Golden State Freeway in the San Fernando area near the Hollywood Freeway interchange. A street sweeper was moving southbound on the freeway, half on the shoulder of the road and half in the number four lane. The sweeper swerved into the southbound number four lane, apparently to avoid a vehicle stalled on the shoulder. To avoid contact with the sweeper, other vehicles swerved also. Defendant King, in the southbound number three lane, swerved across the southbound lanes of traffic, crossed the center divider, and struck plaintiffs' vehicle, injuring both of them.

Plaintiffs sued one Illbrank, King, the County of Los Angeles, the State of California, and the City of Los Angeles. A default was taken

against Illbrank; after discovery but before trial dismissals with prejudice were filed against all defendants except the City.

At trial, the only issue concerning liability was the ownership of the street sweeper, which had left the scene after the accident.

The parties apparently agreed that the street sweeper involved in the accident was a Wayne model 940 or 945. A representative of the company which sold Wayne sweepers in Southern California testified that about 100 similar sweepers were sold during the period from 1965 through July 1969. The City of Los Angeles bought 5 such machines; about 70 others were sold to "municipalities" within the county. It is unclear whether "municipalities" was intended to include the state and county.[1] The sweepers sold to the City were solid yellow; standard factory sweepers—unless a specific color is specified—were yellow on the top half and dark green on the bottom half.

It was stipulated that the only City sweeper that could have been involved in the accident was sweeper 24265, photographs of which were introduced into evidence by plaintiffs. This sweeper was operated by one James Bentley, who had no clear recollection of his activities the day of the accident.[2] Bentley worked a night or early morning shift. He would pick up the sweeper at the yard, which was located on Magnolia, take the Hollywood Freeway to the Los Angeles zoo, sweep the parking lot for several hours and then take the Golden Gate Freeway north to Hanson Dam. Returning, he sometimes would take Laurel Canyon Boulevard from Hanson Dam back to the yard and sometimes the southbound Golden State Freeway to the Hollywood Freeway—a route that would take him past the scene of the accident.

Generally, Bentley serviced the sweeper at the yard, and would return to the yard by 7 or 7:30 a.m. in order to be able to leave work by 8:30 a.m. Thus, he would leave Hanson Dam by about 6 or 6:30 a.m., to get back to the yard by 7 or 7:30 a.m. However, July 21, the date of the accident, was a Monday; and on Mondays and Fridays, Bentley serviced the sweeper at Hanson Dam which meant that if he had taken the Golden State Freeway the day of the accident, he would have been on the freeway about an hour after the accident occurred. Bentley stated

[1]The witness did not testify that either the County of Los Angeles or the State of California bought any of these sweepers.

[2]Bentley's deposition, introduced into evidence, was taken in January 1971, about 18 months after the accident. The trial, at which he testified, was in November 1973.

that he did not see any automobiles on July 21 that might have been involved in an accident.[3]

More definitive data concerning Bentley's activities on the morning of the accident were, apparently, not available. Plaintiff subpoenaed various work and routing forms. A city employee in the department of recreation and parks, to which the sweeper was assigned, testified that routing sheets for sweepers were not maintained until December 1970, so that he could not produce records concerning the activities of sweeper 24265 on the date of the accident.

Plaintiff called two witnesses to identify the sweeper. Judith Classen testified that the sweeper had a flashing yellow light on the top of the cab, had brushes on it and a shiny silver emblem about the size of a headlight on the door of the sweeper. She identified the photograph of sweeper 24265 as appearing to be the sweeper at the accident; the color—which she described as orange—was the same. She had previously observed one or more similar sweepers in the area, mainly on Mondays and Fridays, at about 6:30 a.m.

Erchil Eschbach, a California Highway Patrol officer, was driving in the southbound lanes of the Golden State Freeway when he observed a street sweeper cause the chain-reaction automobile accident described above. He stopped and crossed the freeway to assist the victims; while he was so occupied, the sweeper, which had stopped on the shoulder, left the scene unnoticed by the officer.

Eschbach's identification of sweeper 24265 was not definitive. Sweeper 24265 does not have a rear sweeper; the street sweeper observed at the accident did have a rear sweeper; however, the photograph of sweeper 24265 had a shadow and "with the shadow at that location there it appears the same [with a rear sweeper] as what I first observed." He did not recall any emblem on the side of the sweeper at the accident; sweeper 24265 has an emblem on its side. Eschbach was "sure" that the sweeper he saw had no large mirrors; sweeper 24265 does have large side mirrors. The color of both the sweeper at the accident and sweeper 24265—described as yellow—was the same.

Eschbach also testified, distinguishing the color yellow which he used to describe the City sweeper, that sweepers belonging to the State of California were orange. County sweepers were yellow.

---

[3]If Bentley had taken the freeway the day of the accident at about 7:30 a.m., he could have seen the vestiges of an accident. The police investigation was not completed until 7:53 a.m.

When Eschbach's deposition was taken in January 1971, he testified that the driver of the sweeper was "white . . . Caucasian"; at trial, he was less sure, first testifying that the driver "was a Negro," and then that it "would be easier" to say that the driver "was of darker skin than white," but that he could not state the exact race. He agreed that the "deposition is more correct than what my statement today was . . . ." Bentley is a Negro.

Before the state and county were dismissed as defendants, plaintiffs had served interrogatories on them seeking information about their use and ownership of street sweepers. The county stated, through its attorney, that no sweepers were in use the day of the accident, because it was a legal holiday.[4] The state also answered that no sweepers were in use because July 21 was a legal holiday and admitted to owning a total of 11 Wayne sweepers, located throughout the county.

Carlson, the county attorney who prepared the answers to plaintiffs' interrogatories, testified that he had no personal knowledge of the information furnished in the answers. Nevertheless, over defendant City's objections, the county's answer that there "were no county street sweepers in operation that day due to national holiday" was read into the record. The parties stipulated that Hunt, a Division of Highways maintenance engineer who had verified the state's answers, had no personal knowledge either, and—again over the City's objections—the state's answer to plaintiffs' interrogatories that only one state sweeper was used on July 21, in the late afternoon and on another freeway, was read into the record. Then, at the City's request, the information that the state "only owns 11 Wayne 940's" was read into the record.

Issues concerning plaintiff Marilyn's damages and plaintiffs' own appeal are presented after our discussion of appellant City's basic claims of error.

CITY'S APPEAL

*Sufficiency of the Evidence*

Defendant City's chief contention is that the evidence is insufficient to sustain the verdict and judgment; in brief, that there is no substantial, credible evidence that the street sweeper was owned by the City.

---

[4]July 21, 1969, was the day of the first moon landing.

At the outset, we note that, contrary to the City's apparent assertion, plaintiffs were not required to account for every Wayne street sweeper in the county. We need not say whether plaintiffs would have such a burden if all Wayne sweepers operating in Los Angeles County at that time were alike as peas in a pod. That was not the case: plaintiffs proved that city sweepers had certain characteristics, particularly as to color, which set them apart from other Wayne sweepers and then presented eyewitnesses who—with varying degrees of convincing force —identified the sweeper they saw at the scene as a city sweeper. There is no affirmative evidence that any Wayne sweepers operating in the county—other than the City's—were solid yellow.[5]

Concededly, the evidence is scanty. Bentley, the driver of the only City street sweeper that the parties stipulated could have been the accident vehicle, may or may not have taken the freeway that day. Although his testimony that he serviced the sweeper at Hanson Dam on Mondays and Fridays would have placed him at the scene, if at all, one hour after the accident, Judith Classen testified that she observed one or more sweepers in the area at about 6:30 a.m. mostly on Mondays and Fridays. She identified a photograph of sweeper 24265 as apparently the same sweeper as the one involved in the accident.[6] Officer Eschbach's testimony was equivocal. When his deposition was taken, he stated that the driver was Caucasian or white. He stated that the sweeper at the accident had rear brushes, but his testimony concerning the "shadows" in the photograph, discussed above, is amenable to the inference that the brushes he saw on the sweeper involved in the accident were really shadows.

The evidence supports the judgment.

*Answers to Interrogatories*

The trial court's ruling permitting plaintiffs to offer in evidence the county's and the state's answers to interrogatories was squarely contra to the holding in *Associates Discount Corp.* v. *Tobb Co.,* 241 Cal.App.2d 541, 551-552 [50 Cal.Rptr. 738].

"It would be unreasonable and absurd to permit questions and answers respectively propounded and received in an interrogatory

[5]As noted, there is evidence that county sweepers were yellow, but no proof that the county operated any Wayne sweepers.

[6]One permissible inference from her testimony is that Bentley was mistaken when he testified on deposition that on Mondays and Fridays he would not be at the location at 6:30 a.m.

proceeding between two parties to be used against a third party when the latter is not given the right to propound cross-interrogatories or to exercise the privilege conferred upon the party initiating the proceeding by [Code of Civil Procedure] section 2030 to require the adverse party to whom the interrogatories are directed to make a further response." (See also *Shoei Kako Co.* v. *Superior Court,* 33 Cal.App.3d 808, 813 [109 Cal.Rptr. 402]; *Petersen* v. *City of Vallejo,* 259 Cal.App.2d 757, 776 [66 Cal.Rptr. 776].)[7]

Plaintiffs, however, contend that the 1971 amendment to Code of Civil Procedure section 2030, which authorized the service of interrogatories on "any other party," rather than only on "any adverse party" (compare Stats. 1968, ch. 188, § 1, p. 475) was intended to permit the answers of one defendant to be used by a plaintiff against another defendant, and that *Associates Discount Corp., supra,* and cases relying on *Associates* no longer apply.

This reasoning is hard to follow.[8] Expanding a party's power to seek responses to interrogatories from any other party—adverse, neutral, or downright friendly—is one thing.[9] It enables every party to a lawsuit to determine where every other party stands with respect to questions which may or may not be in controversy.

 It is something quite different, however, to use responses furnished by party B in answer to interrogatories propounded by party A against party C for evidentiary purposes. The basis for the holding in *Associates* that C, the third party—here the City—has no "right to propound cross-interrogatories or to exercise the privilege conferred

---

[7]It is immaterial to our holding that the persons who answered the interrogatories concededly did not base their responses on personal knowledge. It is one of the features of interrogatory practice that the party requesting responses from a corporation or public agency cannot designate the individual who must sign the responses. While a corporation or public agency may select the person who answers interrogatories in its behalf, it has a corresponding duty to obtain information from all sources under its control—information which may not be personally known to the answering agent. (*Mowry* v. *Superior Court,* 202 Cal.App.2d 229, 234 [20 Cal.Rptr. 698]; see DeMeo, Cal. Deposition and Discovery, ¶ 9.29.) What is good discovery law may, however, make no sense when a discovery device is used as a source of evidence against a third party. Witnesses are supposed to know what they are testifying about. (Evid. Code, § 702.)

[8]We leave aside the problem whether plaintiffs' point would apply to this case. The interrogatories in question were served and answered before the 1971 amendment to section 2030 became the law.

[9]In fact, the 1971 amendment to section 2030 was recommended by this court in *Gorman Rupp Industries, Inc.* v. *Superior Court,* 20 Cal.App.3d 28, 30 footnote 2 [97 Cal.Rptr. 377].

upon the party initiating the proceeding . . . to require the adverse party . . . to make a further response" (241 Cal.App.2d at p. 552) is as valid as ever.[10]   Nothing in the 1971 amendment permitting the service of interrogatories on any party expanded the third party's right to inject itself into a discovery process between two other parties. A fortiori, the amendment created no duty to do so—which seems to be plaintiffs' position.

The most that can be said about the effect of the 1971 amendment is that, in a proper case, the third party's knowledge of the issues which are—or are not—developing between two other parties who are not adverse to each other, may trigger the initiation of additional discovery by the third party.   This is no reason, however, to sanction the elimination of the hearsay rule by a backdoor approach—which is precisely what is involved when the response of a party to interrogatories is admitted against a third party who has never had an opportunity to cross-examine the person making the answers.[11]   The language of section 2030, subdivision (c), that answers to interrogatories "may be used to the same extent as provided in subdivision (d) of Section 2016 of this code for the use of deposition of a party" does not magically elevate such answers to the level of testimony given at a deposition. As is observed in DeMeo, California Deposition and Discovery Practice, section 9.32: "It must be recognized, however, that section 2016(d) is not entirely apposite so far as use of answers to interrogatories is concerned, since it provides that 'any part or all of a deposition, so far as admissible under the rules of evidence, may be used against any party *who was present or represented at the taking of the deposition or who had due notice thereof* . . .' Section 2030, of course, contains no provision for cross-interrogatories or for participation by anyone other than the propounding party and the party to whom the interrogatories are addressed. It would therefore seem that answers to interrogatories would

---

[10]As originally enacted, section 2030 was a very private affair between the interrogating party and his "respondent." (Stats. 1957, ch. 1904, § 3, p. 3331.) A 1963 amendment (Stats. 1963, ch. 450, § 1, p. 1284) added the following: "Solely for their information, copies of all interrogatories and of all answers thereto shall be served upon all other parties to the action who have appeared; but the court on motion with or without notice may waive this requirement if the court determines that enforcement thereof would be unduly expensive, oppressive or burdensome." The phrase "solely for their information" was dropped by a 1974 revision of the section (Stats. 1974, ch. 732, § 1), but the trial court's power, exercisable ex parte, to waive the requirement of notice was retained. Whatever may have motivated the 1974 amendment, it clearly did not attempt to equate interrogatory practice with depositions; nor does it retroactively affect the trial of this case.

[11]Even depositions on written interrogatories (Code Civ. Proc., § 2020) permit a party against whom they are to be used to propound cross- and recross-interrogatories.

not ordinarily be admissible against anyone but the answering party." (Italics in original. See also Moore's Federal Practice, § 33.29.)

### Prejudice

■ Although it was error to admit the answers to the interrogatories, an analysis of the entire record fails to show prejudice. There is simply no evidence in the record that on the day in question the county owned any Wayne sweepers.[12] Evidence that the state did own 11 such sweepers came into the record at the City's request after the court had made its erroneous ruling with respect to the State's answer that none of its sweepers was in use on July 21st. We cannot hold this totally justified response to an erroneous ruling against the City, but we can point out that the record contains no evidence that the eyewitnesses could have confused City sweepers with any owned by the state. The only evidence in the record concerning the appearance of State sweepers is to the effect that they are orange, not yellow. That evidence came from Officer Eschbach who had no problems distinguishing the state's orange from the City's yellow.

Thus, it appears that the interrogatory issue is really much ado about nothing. On the record we have, county sweepers never were candidates for this accident. State sweepers were eliminated by the only evidence concerning their appearance.

Consequently, we are not "of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.)

### DAMAGES

Defendant's other contentions relate to damages.

Plaintiff Marilyn was employed by the county at about $100 a week. She was physically able to return to her county job in November 1969 but did not do so until April 1970. ■ She claimed damages for lost earnings for that period based on her testimony that "I went back to work in November, but I found they didn't want me; they hired a new girl. They told me it was too long to wait."

---

[12]For what it is worth—and in view of our discussion concerning the admissibility of the county's answers to interrogatories, that is very little—an answer to another interrogatory, not read to the jury, affirmatively indicates that the county did not own any Wayne sweepers.

Defendant contends that the testimony was inadmissible hearsay. We disagree. Plaintiff Marilyn was testifying to what occurred when she attempted to go back to her job. She acted on what she heard and observed and her testimony was, for the purpose of establishing that she had not worked for the county for some period after she was physically well, no more hearsay than if she had testified that a supervisor shut the door in her face.[13]

Defendant's next point is closely related to the only issue raised on plaintiffs' own appeal. Plaintiff Marilyn had, a few weeks before the trial, answered a written interrogatory to the effect that she had fully recovered. Shortly thereafter she was orally deposed by defendant. At that time she complained rather mildly of certain residual effects of her injuries. When she testified to the same effect, defendant objected.

In view of plaintiff's deposition testimony, defendant could hardly claim surprise. (Compare *Campain* v. *Safeway Stores, Inc.,* 29 Cal.App.3d 362, 366 [104 Cal.Rptr. 752].) ■ The contradiction between the answer to the interrogatory and Marilyn's trial testimony, did not in itself affect the admissibility of the latter. (*Weiss* v. *Baba,* 218 Cal.App.2d 45, 48 [32 Cal.Rptr. 137].)

Defendant also complains about a $300 bill for dental work allegedly admitted without foundation. The record, however, does not indicate that the bill was actually admitted in evidence.

PLAINTIFFS' APPEAL

The only issue raised on plaintiffs' appeal relates to the trial court's exclusion of the testimony of a Doctor Levine, who had examined plaintiff Marilyn three days before trial. Defendant City complained that admission of his testimony would violate California Rules of Court, rule 222, limiting discovery within 30 days before trial, and that the doctor would be a "surprise witness."

Counsel for the City also stated: "Your Honor, for the record, may I state that on September 12th of this year I sent a letter, a copy of which is here in this file, to Mr. Gregg, asking that his clients be examined by our doctor. Subsequently on October 15th we received answers to interrogatories stating very clearly that both of his clients were fully recovered

---

[13]These observations do not necessarily apply to the last sentence of Marilyn's answer. The objection, however, was to all of it.

from any injuries they received in our accident. Based upon those answers I called Mr. Gregg and cancelled the physician that we had arranged to have his clients see, and he never did tell us about any further doctor."[14]

Plaintiff's counsel never explicitly stated what he intended to prove by the testimony of a doctor who had examined one of his clients more than four years after the accident in question.

█ Under the circumstances we find no error. While we doubt that California Rules of Court, rule 222, prohibits parties from generating evidence—as distinguished from initiating discovery—within 30 days of trial, the defense point that the City would be unfairly surprised by the witness had merit. The City never produced any medical testimony and its counsel's statement that after receiving answers to interrogatories on October 15, he cancelled a medical examination on behalf of the City stood unchallenged. Under all of these circumstances we cannot say that the court's exclusion of Doctor Levine's testimony was not within its basic power to insure that all parties receive a fair trial.

The judgment is affirmed.

Stephens, J., and Ashby, J., concurred.

---

[14]Plaintiff's counsel took no issue with these assertions. He merely observed that defense counsel had not spoken to him personally. No contention to that effect had, however, been made.