[No. A038891. First Dist., Div. Five. Apr. 14, 1988.]

PEAT, MARWICK, MITCHELL & COMPANY, Petitioner, v.
THE SUPERIOR COURT OF CONTRA COSTA COUNTY,
Respondent;
THE PEOPLE et al., Real Parties in Interest.

274

**COUNSEL**

Boake Christensen, James B. Lewis, Leslie G. Landau, David M. Heilbron and McCutchen, Doyle, Brown & Enersen for Petitioner.

No appearance for Respondent.

John K. Van de Kamp, Attorney General, Randall P. Borcherding, Deputy Attorney General, Jan T. Chilton, Robert L. Lofts, Donald J. Querio and Severson, Werson, Berke & Melchior for Real Parties in Interest.

**OPINION**

**HANING, J.**—The accounting firm of Peat, Marwick, Mitchell & Company (Peat Marwick), defendant in an accounting malpractice action, petitions for extraordinary relief from an order precluding it from controverting plaintiffs' evidence on certain elements of the malpractice allegations. After Peat Marwick merged with KMG Main Hurdman (Main Hurdman), the accounting firm retained by plaintiffs as their expert witness, the trial court made the preclusion order to prevent the compromise of confidential information and to preserve the integrity of the judicial process. Peat Marwick contends the trial court was without power to enter a preclusion order in the absence of statutory authorization, and that any such power the court did enjoy was abused under the facts of this case.

We summarily denied Peat Marwick's petition, but the California Supreme Court granted review and transferred the matter back to this court with directions to issue the alternative writ. We issued the writ and heard oral argument. We conclude that the petition is without merit.

I

A

The underlying action concerns the financial failure of Western Community MoneyCenter (MoneyCenter), a Contra Costa-based thrift and loan corporation and former Peat Marwick client. At the time of its failure MoneyCenter had approximately 12,000 thriftholders, mostly Contra Costa residents, with accounts reportedly totalling about $98 million. On April 20, 1984, the California Commissioner of Corporations (Commissioner) placed MoneyCenter in liquidation. On May 29, 1984, the Commissioner, in the name of the People of the State of California (the People) filed suit on behalf of MoneyCenter thriftholders, creditors and the liquidation estate. The suit sought to recoup an estimated $25 million deficit allegedly caused by the intentional and negligent mismanagement by MoneyCenter officers and directors. On November 15, 1984, the Commissioner, joined by the Attorney General, filed a first amended complaint adding Peat Marwick as a defendant based on an allegedly negligent audit which contributed to the MoneyCenter decline. The People alleged that MoneyCenter's failure resulted from "the mismanagement of that financial institution by the officers and directors responsible for it, the intentional misconduct of certain of those officers and directors and the failure of its certified public accountants to properly audit its financial affairs."

The following background facts are allegations taken from the People's complaint.

Peat Marwick had been hired by MoneyCenter in September 1982 to audit MoneyCenter's financial affairs. One purpose of the audit was to provide financial reports to the Commissioner and to each MoneyCenter thriftholder, in conformity with Financial Code section 18406.[1] Peat Marwick misrepresented that its auditing personnel were adequately trained and that its proposed audit methods complied with applicable law. Peat Marwick conducted the audit and in early 1983 issued its audit reports which

---

[1] Financial Code section 18406 states: "Each industrial loan company which has issued and which has outstanding investment certificates shall: [¶] (a) Post in a conspicuous and prominent place in each business location a condensed statement of its financial condition, and [¶] (b) Furnish to a person prior to such person's investment in an investment certificate a copy of its latest condensed statement of its financial condition. Each year a copy of the condensed statement shall be furnished by mail or hand-delivered to each investment certificate holder. [¶] (c) Maintain and have available for public inspection a copy of its latest audited financial statement required by subdivision (a) of Section 18405 in each of its business locations. Any person shall, upon request, be permitted to inspect the statement during regular business hours. [¶] (d) The statement required by subdivisions (a) and (b) shall set forth such information and be in such form as may be required by the commissioner."

contained inaccurate and misleading information concerning MoneyCenter's financial solidity as of December 31, 1982. These reports overstated MoneyCenter income, falsely stated a net income of over $1 million, understated the loan loss reserve, and failed to mention the deficiencies of MoneyCenter's books and records. It is further alleged that Peat Marwick was not an independent auditor "because of its dual role as auditor and management consultant, its preparation of missing accounting documents for MoneyCenter which it then proceeded to audit, and the negotiations by at least one member of Peat Marwick's supporting staff for the acquisition of an equity interest" in the holding company which owned all MoneyCenter stock.

Peat Marwick did not notify the Commissioner, creditors, or thriftholders when it discovered the inaccuracies of its audit. Had the Commissioner been made aware of the audit's falsity, he could have taken appropriate corrective steps. In reliance on the inaccurate audit, the Commissioner allowed MoneyCenter to continue its operations; thriftholders continued to place their funds with MoneyCenter and creditors continued to extend credit. As a proximate result of reliance on the audit, MoneyCenter became insolvent and the creditors and thriftholders were damaged by an alleged deficit, or shortfall, in the liquidation estate of over $25 million.

The People's complaint sets out 11 causes of action against MoneyCenter officers and directors and others, alleging claims of improper intercorporate transfers, negligent management, breach of fiduciary duty and misrepresentations of the financial condition of MoneyCenter. Three additional causes of action, the Eleventh, Twelfth and Thirteenth, accuse Peat Marwick of negligently performing its audit, of breaching its contract with MoneyCenter to perform the audit in compliance with general accounting principles, and of negligently misrepresenting its audit's conclusions. Peat Marwick is also named as defendant in two causes of action alleging unfair competition and untrue and misleading advertising. (Bus. & Prof. Code, §§ 17200, 17500.)

B

The facts of Peat Marwick's merger with the People's accounting expert are the foundation of the trial court's preclusion order, and are taken almost entirely from the trial court's findings of fact. ▄▄ These findings are binding on this court unless unsupported by substantial evidence. (*Foot's Transfer & Storage Co.* v. *Superior Court* (1980) 114 Cal.App.3d 897, 902 [171 Cal.Rptr. 1].) Peat Marwick has not shown, indeed has not attempted to show, that the findings of fact are unsupported by substantial evidence. Peat Marwick has for the most part merely restated its own evidence, and

not the contrary evidence on which the trial court relied. (See *Foreman & Clark Corp* . v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].) Accordingly, we recite the facts as found by the trial court, and supported by the record.

After the People initiated their MoneyCenter lawsuit in May 1984, they recognized the need to retain an accounting firm as an expert witness in the forthcoming complicated litigation. Of the available "Big Eight" accounting firms, Main Hurdman appeared the best qualified. In the autumn of 1984 the People retained Main Hurdman as a professional accounting litigation expert in the MoneyCenter action. There were two primary aspects to Main Hurdman's role as expert—Peat Marwick's professional negligence, and the amount of the deficit, or shortfall, in the MoneyCenter liquidation estate.

With respect to professional negligence, Main Hurdman concluded that Peat Marwick's 1982 audit of the MoneyCenter books was negligently performed and the People had a valid case of accounting malpractice against Peat Marwick. In particular, Main Hurdman advised the People that instead of a $1 million profit, the MoneyCenter had incurred a multimillion dollar loss. Much of Main Hurdman's work on the issue of professional negligence had been completed by the end of 1984, by which time Peat Marwick had been named and served as a defendant. Main Hurdman then actively assisted the People's attorneys in formulating litigation strategy related to the 1982 audit. After the issue of accounting malpractice had been addressed, the People directed Main Hurdman to assess, as the measure of damages, the precise amount of the deficit in the MoneyCenter liquidation estate. The estimated shortfall ultimately rose to $41 million from the $25 million alleged in the complaint.

For almost the entire time Main Hurdman was the People's litigation expert, it and defendant Peat Marwick were in the process of negotiating a merger. Shortly after Main Hurdman was retained by the People, merger negotiations commenced. The trial court found that the merger's genesis could be traced back to December 1984 and January 1985 when there were "early exchanges of information." Although fully aware of the manifest conflict of interest which would be created by a merger between Peat Marwick as defendant and Main Hurdman as plaintiffs' expert, Main Hurdman continued discussions and negotiations with Peat Marwick throughout the spring and summer of 1985. The negotiations ended in September 1985 when certain international partners of Main Hurdman disagreed with the proposed merger.

For what the trial court found were "undoubtedly . . . good business reasons," the negotiations were cloaked in secrecy, complete with code

names to disguise the real parties. In spite of these efforts at secrecy there was a "leak" to the press and a story appeared in the Wall Street Journal. However, before the People's attorneys learned anything of the proposed merger, Main Hurdman's regional managing partner assured them in early September 1985 that there was no truth to the "rumors" of merger talks between Peat Marwick and Main Hurdman. Having this assurance, the People continued with Main Hurdman as their chosen expert.

In March 1986 the People learned that Mr. Richard Miller, the in-house associate general counsel for Peat Marwick who was primarily responsible for the defense of the professional negligence lawsuit, was joining the staff of Main Hurdman as general counsel. Understandably alarmed at the potential consequences of this transfer, the People's attorneys pressed the issue. They were given assurances by Main Hurdman that confidences would be respected and a promise from Peat Marwick that it would not use the Miller transfer to disqualify Main Hurdman as the People's expert.

Next, the People experienced two revelations deemed, understandably, by the trial court to be "disquieting" and "alarming." First, the People learned that Peat Marwick's attorneys had been contacted to represent Main Hurdman in a series of lawsuits in which it was being sued for accounting malpractice (the Technical Equities cases). Second, the People discovered that Peat Marwick's attorneys already had been informed that Main Hurdman was serving as the People's expert witness. Not surprisingly, the People declined to give the consent which Peat Marwick's attorneys sought in order to allow them to represent Main Hurdman in the Technical Equities litigation.

In early May 1986 Main Hurdman reopened merger negotiations with Peat Marwick when the former's Canadian affiliate defected to another "Big Eight" accounting firm. Believing its "North American flank" was exposed, Main Hurdman actively pursued merger with Peat Marwick during the summer of 1986. By August 28, 1986, a letter of intent was signed and on October 3, 1986, a memorandum of understanding was executed and submitted for a vote to the partners of the two firms.

It was not until mid-August that Main Hurdman decided to disclose the pending merger to the People. Before this happened, counsel for the People learned of the proposed merger from a news account in the Wall Street Journal. A meeting between counsel and top Main Hurdman executives was held on September 12, 1986. In the exact language of the trial court, "[F]or the first time Main Hurdman faced up to the conflict of interest problems it and Peat Marwick had created. With no obvious solution evident, it is apparent that the parties left the meeting hoping that the lawsuit would be

settled so that the problem would disappear." Thereafter, and with the apparent consent of the People, Main Hurdman continued its work on the deficit aspect of the People's case. Main Hurdman submitted its report on that subject on January 29, 1987, and then unilaterally terminated its relationship with the People.

The trial court found that Main Hurdman's work as the People's expert involved a total of 68 staff members and over 12,000 hours of work. The billing for these services was $683,379, of which $620,569 had been paid. The engagement as expert for the People was the largest single engagement of the San Francisco office of Main Hurdman at that time.

The Peat Marwick-Main Hurdman merger was scheduled to occur effective April 1, 1987. On March 9, 1987, the People moved for an injunction against the merger or, in the alternative, for an order imposing sanctions against Peat Marwick for merging with the People's expert during pendency of the litigation. The requested sanctions included an order precluding Peat Marwick from controverting those matters to which Main Hurdman would have testified: Peat Marwick's standard of care, the defects in the 1982 audit, and the amount of the liquidation estate's deficit as a measure of the People's damages. The motion also sought an order directing Peat Marwick to return the $620,569 in expert fees paid Main Hurdman by the estate.

In its responsive papers Peat Marwick opposed an injunction on the eve of the merger, and proposed that screening Peat Marwick personnel from Main Hurdman's knowledge of the People's case would obviate the need for sanctions. Such a screening mechanism would erect barriers of communication and information transfer between Main Hurdman employees and those of Peat Marwick so that even after the merger all privileged information would be "sealed off" from Peat Marwick's MoneyCenter litigators.[2]

After evidentiary hearings, on March 27, 1987, the trial court denied the injunction on the ground that the balance of hardships favored Peat Marwick. The court granted the People's alternative request for sanctions, and ordered that "Peat Marwick is precluded . . . from introducing any evidence on the issues of: (i) standard of care, (ii) negligence, and (iii) damages." The order did not apply to the element of proximate cause. The preclusion order was made "without prejudice to Peat Marwick's right . . . to seek relief prior to trial from this preclusion order by demonstrating to the Court that it has in place an effective and verifiable system of protection

---

[2] For a description of such screening mechanisms and their use, see generally Note, *The Chinese Wall Defense to Law Firm Disqualification* (1980) 128 U.Pa.L.Rev. 677.

against disclosure of privileged information by former Main Hurdman partners and staff."[3]

The order was filed April 17, 1987, and challenged by extraordinary writ on June 16, 1987. Meanwhile, Peat Marwick had moved for relief from the preclusion order on the ground that it had erected an adequate screen. The motion for relief was still pending when the writ petition was filed. The trial court conducted several days of evidentiary hearings on the motion for relief, in part because Peat Marwick "stressed the importance of [the trial] court hearing oral testimony so that credibility of witnesses could be assessed." The court also reviewed again the evidence presented at the March injunction hearings.

On June 22, 1987, the trial court filed its order denying relief. That order (1) made the findings of fact set forth above; (2) found that Peat Marwick's screening procedures were inadequate; and (3) reversed itself as to damages on the ground that the People had "acquiesced in (if not encouraged) work on the 'estate' deficit well after the conflict of interest was disclosed and the merger had been voted upon," and thus "waived any claim of privilege which is essential to support a claim of breach of a confidence."

With regard to the issues of negligence and standard of care, the trial court was "not persuaded" that the measures "instituted or proposed by Peat Marwick . . . to protect plaintiffs' confidences are sufficient to justify lifting the remaining preclusion orders. Those measures are, quite simply, too little and too late." In support of this conclusion, the trial court made further findings of fact.

The court first noted that in its opposition to the People's motion to enjoin the merger, Peat Marwick had "convincingly" argued that there had been a "de-facto merger" between the two firms by March 1987. This argument, while demonstrating a balance of hardships against an injunction to undo what had already happened, seemed to backfire on the issue of the alleged screening mechanism. While Peat Marwick established that several measures had been installed or proposed, the de facto merger demonstration revealed that "personnel had been exchanged, transfers made, commitments to hire made, leases cancelled, as well as countless other significant commitments toward consolidation. While all of this was going on, however, there were no formal measures in place to protect plaintiffs' confidences. The Code of Professional Ethics was the sole protection."[4]

---

[3] The order also directed the repayment of the requested expert fees of $620,569. This portion of the order is not at issue in this writ proceeding.

[4] Rule 301 of the American Institute of Certified Public Accountants (AICPA) Code of Professional Ethics bars disclosure of "any confidential information obtained in the course of

Main Hurdman's chief executive officer (CEO) "candidly" conceded that he had no plan to protect confidences—he simply believed "something could be worked out." On April 1, 1987, the effective date of the merger, a list of the names of the Main Hurdman and Peat Marwick personnel who worked on the MoneyCenter litigation had not even been prepared, much less exchanged, and the CEO's formal directive concerning nondisclosure came only after the preclusion order was entered.

The trial court considered the credibility of Peat Marwick's witnesses who attested to the success of the screening mechanism. In a passage emphasized by Peat Marwick, the court acknowledged that "The good intentions of all witnesses, both testifying and by declaration, are not doubted." In the succeeding sentence, essentially ignored by Peat Marwick, the court qualified its belief in good intentions: "But there was in some instances a revealing lack of recollection as to significant events not likely to have been forgotten. Moreover, the gap in confidence is widened, not so much by what those who testified did say, as by the absence of testimony or other evidence on key issues."[5]

As an example, the trial court referred to the evidence that oral reports on the status of pending negotiations had been exchanged during merger negotiations. However, no written reports were exchanged and the contents of oral reports were "unknown." The court found credible testimony that Main Hurdman's general counsel was asked to give Peat Marwick "anything they wanted." The court was "left to speculate what those litigation reviews included. If one must speculate, it seems inconceivable that professional accountants would not review critically and in detail the exposure the pending litigation they might be buying into could bring." Although the postmerger entity of Peat, Marwick, Main & Co. is apparently not formally responsible for any judgment in the proceedings below, the court sagaciously observed that a judgment against Peat Marwick would necessarily reduce Peat, Marwick, Main profits. The court concluded it had "misgivings about what was not presented."

Having found the screening mechanism inadequate, the court went on to find that the People had been harmed by the merger. The court specifically

a professional engagement except with the consent of the client." (AICPA, Code of Professional Ethics, Responsibilities to Clients § 301 [eff. Mar. 1, 1973].) The Rules of Professional Conduct for California accountants provides "No information obtained concerning a client in the course of engagements shall be disclosed except with permission of the client . . . ." (Tit. 16, Cal. Admin. Code, § 54, subd. (a).)

[5] This is an example of the "curious incident of the dog in the nighttime," a literary allusion often invoked but seldom explained. The "incident of the dog" was cited by Sherlock Holmes as the clue to the nighttime abduction of a racehorse from its trainer's barn. Dr. Watson noted quizzically that "the dog did nothing in the nighttime." Holmes replied "That was the curious incident." It was the trainer himself who took the horse, and the watchdog, sensing its owner, did not bark.

found "that the merger of Peat Marwick and Main Hurdman has seriously eroded the ability of plaintiffs to prepare and present their case. It is not simply a situation in which plaintiffs can go out into the marketplace and find a new 'hired gun.' The initial selection of Main Hurdman was difficult enough because of the many parties involved in the case and the conflicting interests which other large accounting firms had. The impact of Main Hurdman's defection to a significant adverse party cannot be underestimated. For anyone experienced in the dynamics of trial, it is plain that trial theories and strategies must be entirely reassessed and restructured."

The court found additional harm to the integrity of the judicial system. "[T]he subtle aura of potentially compromised confidences—the appearance of impropriety alone—undermines public confidence in the integrity of the litigation process. The circumstances of this case demand far more than what a [screening mechanism] can provide to restore confidence and provide assurance that the system of justice has not tilted in favor of one party."

The trial court concluded as follows: "The measures in place and those proposed, especially when viewed in the light of the history of this case, provide insufficient assurance that confidential information will not, at least inadvertently, be compromised. [fn.] That history discloses that Main Hurdman, which is now an indistinguishable part of the very entity it was chosen to challenge, sacrificed a client to whom it owed a fiduciary duty solely for its own financial self-interest. Likewise Peat Marwick, knowing it was acquiring the pivotal expert witness of its adversary, made a calculated business decision to go forward with a merger, the predictable results of which included: breach of an attorney-client relationship; jeopardized client confidences; and, a cloud of suspicion over the litigation process. For Peat Marwick it may have been a sound business decision. But Peat must also be prepared to accept the consequences of meddling with the integrity of the judicial system. For that intrusion, it will not be allowed to controvert what Main Hurdman would have said about its professional competence in performing the 1982 audit."[6]

## C

Peat Marwick filed its writ petition June 16, 1987, *before* the trial court had ruled on its motion for relief from the April 17 order and had filed the order of June 22. The latter order supersedes the April 17 order, reverses it

---

[6] In its footnote 1 the trial court noted: "Among the measures suggested, Peat Marwick cavalierly suggests that . . . certain key former Main Hurdman staff will be transferred out of California or even fired . . . . Such a suggestion is an affront and only underscores the impersonal and pitiless economic self-interest which pervades this case."

in part by removing the damages issue from the scope of preclusion, and sets forth the trial court's extensive findings of fact. Inexplicably, Peat Marwick never attempted to amend its petition to mount a challenge to the June 22 order, and did not effect a challenge by filing a separate writ petition. A reading of the June 22 order clearly showed that Peat Marwick's version of the facts was substantially inaccurate. Peat Marwick's failure to challenge the operative order of the case led us to summarily deny the petition on July 21, 1987.

Peat Marwick then petitioned the Supreme Court for review, substantially ignoring the trial court's June 22 order and its findings of fact. The Supreme Court granted review and transferred the case to this court with instructions to issue the alternative writ.

## II

■ Having been directed to review this case by the order of the Supreme Court, we begin by noting a procedural deficiency which would normally preclude review by extraordinary writ. The Supreme Court's grant-and-transfer order directed us to issue an alternative writ in response to the petition as filed in this court. As noted, that petition predates the operative June 22 order and challenges only the order of April 17. It is, of course, axiomatic that a party can only obtain extraordinary relief from a particular order by means of a proper verified petition challenging that order and explaining why the order is an abuse of discretion or an excess of jurisdiction, and why remedies at law are inadequate. Peat Marwick has made no such challenge to the June 22 order. Thus, we find ourselves faced with a directive to afford extraordinary writ review to a petitioner who has failed to challenge the operative order in the case, an order which supersedes the challenged order, reverses it in part, and bears significant findings of fact.

We asked Peat Marwick at oral argument to comment on our procedural concerns. Peat Marwick contended that because the June 22 order was appended to the People's answer to the petition for review, the grant-and-transfer order effectively placed the June 22 order before this court for extraordinary review. Peat Marwick has presented no authority for the rather novel proposition that a Supreme Court grant-and-transfer, a common process of replacing a summary denial of a writ with a written opinion, can substitute for a formal, verified writ petition challenging a specific order and setting forth the appropriate prerequisites for extraordinary relief. (See generally, California Civil Writ Practice (Cont.Ed.Bar 1987) § 3.1 et seq., § 7.1 et seq.) On the contrary, a grant-and-transfer order is not even an indication of the substantive merit of the petition. ■ "The Supreme

Court's direction that we issue the alternative writ, after our denial, is an expression on the part of the Supreme Court that we examine the contentions raised by the petitioner and write an opinion evaluating those contentions." (*Charlton* v. *Superior Court* (1979) 93 Cal.App.3d 858, 861 [156 Cal.Rptr. 107].) Such an order does not cure procedural defects in the petition. (*Ibid.*; see *Star Motor Imports, Inc.* v. *Superior Court* (1979) 88 Cal.App.3d 201 [151 Cal.Rptr. 721].) We doubt that a grant and transfer serves as a functional substitute for a formal petition to challenge a trial court order.

Peat Marwick's failure to properly challenge the June 22 order, coupled with the Supreme Court's direction to afford writ review, places us in the position of reviewing either an order which has been rendered moot, or an existing order which has not been properly challenged. We presume the Supreme Court does not want us to engage in the futile exercise of reviewing a moot order—especially one which has been superseded at the specific request of the petitioner. Therefore, we proceed to review the substantive contentions of the petition under the existing order of June 22.[7]

### III

Peat Marwick makes two arguments: (1) the trial court lacked legal authority to render its preclusion order, and (2) assuming it had authority the order is an abuse of discretion on the facts of this case. Both arguments are unpersuasive.

#### A. *The Preclusion Order Is Authorized*

 Peat Marwick contends that the preclusion order is not explicitly authorized by statute and is therefore invalid. The contention is based on this chain of reasoning: (1) the preclusion order is a "discovery sanction"; (2) all discovery sanctions must be specifically authorized by statute; (3) the preclusion order is not so authorized; and (4) the court lacked authority to make the order. The flaw in this chain is its first premise: the court's order precluding evidence is not a sanction for the abuse of discovery procedures, but is a remedy for abuse of the litigation process.

The People's motion below sought "sanctions," not "discovery sanctions." One side or the other may have begun to use the phrase "discovery

---

[7] We emphasize this procedural problem because Peat Marwick, both in its briefing, and again at oral argument, stressed what it claims to be deficiencies in the original, superseded order of April 17. However, since it successfully prevailed upon the trial court to reconsider and issue a new order, the order of June 22 is the only operative order in the record for review.

sanctions," or the connection to discovery may have been made because the People's points and authorities cited four cases which involved the preclusion of evidence as a sanction, but which arose from a discovery context. (*Puritan Ins. Co.* v. *Superior Court* (1985) 171 Cal.App.3d 877 [217 Cal.Rptr. 602]; *Wm. T. Thompson Co.* v. *General Nutrition Corp.* (C.D.Cal. 1985) 104 F.R.D. 119; *United States* v. *ACB Sales & Service Inc.* (D.Ariz. 1982) 95 F.R.D. 316; *Barker* v. *Bledsoe* (W.D.Okla. 1979) 85 F.R.D. 545.) These cases were cited, however, for the general proposition that a trial court has inherent authority to preclude evidence to police an abuse of the litigation process. They do not, and should not, make this a "discovery sanction" case.

■ Peat Marwick places considerable emphasis on the contention that the preclusion order is tantamount to a dismissal; from this claim Peat Marwick moves to a discussion of numerous authorities which hold that dismissal as a discovery sanction should only be employed sparingly as a last resort when a party has destroyed evidence or acted in bad faith. (See, e.g., *Societe Internationale* v. *Rogers* (1958) 357 U.S. 197, 208-212 [2 L.Ed.2d 1255, 1264-1267, 78 S.Ct. 1087]; *Evarone* v. *Twentieth Century Hosts, Inc.* (1979) 98 Cal.App.3d 90, 93, 95 [159 Cal.Rptr. 294]; *Kahn* v. *Kahn* (1977) 68 Cal.App.3d 372, 380-382 [137 Cal.Rptr. 332]; see also Code Civ. Proc., § 2023, subd. (b).)

The characterization of the preclusion order as a dismissal is fundamentally incorrect. It apparently arises from remarks by the trial court at an earlier stage of the proceedings, when the court was contemplating a preclusion order covering standard of care, negligence *and damages* estimated at $41 million. At that point the trial court stated the order would be "the functional equivalent of striking Peat Marwick's answer, granting a default judgment to the [People], or perhaps granting the [People] a judgment on the pleadings." Peat Marwick points to this language and repeatedly characterizes the preclusion order as functionally the same as a default judgment or dismissal. The trial court's language, however, predated the June 22 order's modification of the preclusion order as to damages. As Peat Marwick may litigate the amount of damages, as well as the issue of proximate cause, the claimed "functional equivalence" to a default judgment is no longer present. Moreover, while the preclusion of defense evidence is no doubt an onerous sanction, the preclusion does not amount to a summary adjudication of the issue of negligence and standard of care. The People must still present evidence on these issues sufficient to satisfy their burden of proof.

■ The real question in this case is whether a California trial court has the inherent power to preclude evidence to cure abuses or overreaching

involving confidential information, such as the merger with one's opponents' expert. We conclude the trial courts do indeed have such inherent power and do not need a specific statutory authorization to prevent injustice by excluding certain evidence.

■ Our Supreme Court has recognized that California courts have inherent powers, independent of statute, derived from two distinct sources: the courts' "equitable power derived from the historic power of equity courts" and "supervisory or administrative powers which all courts possess to enable them to carry out their duties." (*Bauguess* v. *Paine* (1978) 22 Cal.3d 626, 635 [150 Cal.Rptr. 461, 586 P.2d 942], citations omitted.) "Although the latter power has been recognized by the Legislature in Code of Civil Procedure section 128, it exists apart from express statutory authority." (*Id.*, at pp. 635-636, fn. & citations omitted.) In support of this proposition *Bauguess* cites *Bloniarz* v. *Roloson* (1969) 70 Cal.2d 143, 147-148 [74 Cal.Rptr. 285, 449 P.2d 221]: "As distinguished from equity jurisdiction, every court of record has powers requisite to its proper functioning as an independent constitutional department," including the powers to punish for contempt and to preserve order in judicial proceedings. Lower courts are in accord: "Courts are not powerless to formulate rules of procedure where justice demands it" (*Adamson* v. *Superior Court* (1980) 113 Cal.App.3d 505, 509 [169 Cal.Rptr. 866], citing *Addison* v. *State of California* (1978) 21 Cal.3d 313, 318-319 [146 Cal.Rptr. 224, 578 P.2d 941]); the inherent power of courts to control and prevent abuses in the use of their process "does not depend upon constitutional or legislative grant." (*Arc Investment Co.* v. *Tiffith* (1958) 164 Cal.App.2d Supp. 853, 856 [330 P.2d 305].)[8]

The trial court's inherent powers have been recognized, endorsed and affirmed in a considerable body of authority, and the powers have been flexibly applied in response to the many vagaries of the litigation process. In *Conn* v. *Superior Court* (1987) 196 Cal.App.3d 774 [242 Cal.Rptr. 148], the trial court directed the wrongful-termination plaintiff to return to his former employer documents he had removed from his office. In upholding the order the Court of Appeal ruled the action was within the court's "inherent power to control the proceedings before it and to make orders which prevent the frustration, abuse, or disregard of the court's processes. [Citation.]"

---

[8] Peat Marwick argues that *Bauguess* and similar cases stand for the proposition that all sanctions must be statutorily authorized. This argument fundamentally misinterprets the *Bauguess* decision, which in fact recognized courts' inherent powers to sanction misbehavior. The cases cited involve rejections of nonstatutory awards of attorney fees, and are inapposite. Courts have been more reluctant to exercise fee awards without statutory imprimatur not because the courts lack the power, but for reasons of policy. "The use of courts' inherent power to punish misconduct by awarding attorney's fees may imperil the independence of the bar and thereby undermine the adversary system." (*Bauguess* v. *Paine, supra,* 22 Cal.3d at p. 638.)

(*Id.*, at p. 785.) In *Western Steel & Ship Repair, Inc.* v. *RMI, Inc.* (1986) 176 Cal.App.3d 1108, 1116-1117 [222 Cal.Rptr. 556], the court concluded that the trial court had the inherent power, in the proper case, to afford immediate ex parte relief to a debtor in attachment when such power was not statutorily authorized. "Such power is part of the inherent power of the superior court (and of courts generally) *to control litigation before it, to prevent abuse of its process, and to create a remedy for a wrong even in the absence of specific statutory remedies.* [Citations.]" (*Id.*, at p. 1116, italics added.) In *Venice Canals Resident Home Owners Assn.* v. *Superior Court* (1977) 72 Cal.App.3d 675 [140 Cal.Rptr. 361], the trial court required the posting of a stay bond in a mandamus action to protect the rights of innocent third parties who had obtained building permits and commenced construction. "Similar inherent power has been recognized as available to the court to prevent unfair results, although the relevant statute itself contains no provision for such limitation." (*Id.*, at p. 680.) Additional examples are cited and discussed in both the *Western Steel* and the *Venice Canals* decisions.

The court's inherent power to curb abuses and promote fair process extends to the preclusion of evidence. Even without such abuses the trial court enjoys "broad authority of the judge over the admission and exclusion of evidence." (3 Witkin, Cal. Evidence (3d ed. 1986) Introduction of Evidence at Trial, § 1707, p. 1667.) As the People observe, trial courts regularly exercise their "basic power to insure that all parties receive a fair trial" by precluding evidence. (*Castaline* v. *City of Los Angeles* (1975) 47 Cal.App.3d 580, 592 [121 Cal.Rptr. 786] [exclusion of 11th-hour witness's testimony to prevent surprise]; *Clemens* v. *American Warranty Corp.* (1987) 193 Cal.App.3d 444, 451 [238 Cal.Rptr. 339]; *Hyatt* v. *Sierra Boat Co.* (1978) 79 Cal.App.3d 325, 337 [145 Cal.Rptr. 47].) In so doing trial courts generally employ the "motion in limine," which is "not expressly authorized by statute" but is within the trial court's "inherent power to entertain and grant." (3 Witkin, *op. cit. supra,* § 2011, p. 1969.) "The scope of such motion is any kind of evidence which could be objected to at trial, either as irrelevant or subject to discretionary exclusion as unduly prejudicial." (*Clemens* v. *American Warranty Corp., supra,* at p. 451, citations omitted.) Its purpose is to avoid the unfairness caused by the presentation of prejudicial or objectionable evidence to the jury, and the "obviously futile attempt to 'unring the bell.' . . ." (*Hyatt* v. *Sierra Boat Co., supra,* at p. 337.)

In one sense the preclusion order in this case is a grant of a motion *in limine* to exclude evidence. We need not rest the order under the *in limine* rubric, however, as numerous cases have not relied on that motion procedure to exclude evidence to prevent an abuse or an unfair advantage by a party to litigation. In some cases the courts have acted under the

auspices of statute or rule. (*Puritan Ins. Co.* v. *Superior Court, supra,* 171 Cal.App.3d 877; *United States* v. *ACB Sales & Service, Inc., supra,* 95 F.R.D. 316.) In others the courts have invoked their inherent power to exclude evidence to ensure a fair and orderly trial. In *Barker* v. *Bledsoe, supra,* 85 F.R.D. 545, the plaintiff's expert examined evidence, but destroyed it without notice to the defense, thereby preventing the defense from conducting its own examination. The court relied upon its inherent power to ensure the defense received a fair trial, and precluded the expert from testifying about his examination. Similarly, in *Wm. T. Thompson Co.* v. *General Nutrition Corp.* (C.D.Cal. 1984) 593 F.Supp. 1443, a party had wrongfully destroyed documentary evidence; the District Court recognized its inherent power to prevent the party from advancing evidence controverting the documents' contents. Under the factual circumstances before it, however, the court rejected a preclusion order as insufficiently severe, and imposed the more severe sanction of dismissal.

Contrary to Peat Marwick's assertion, there is no legal or logical reason to limit inherent-power preclusion orders to cases involving the destruction of evidence. A party may be disadvantaged as much by the destruction of evidence as by the invasion or destruction of a unique relationship with its expert witness. Moreover, there is no intrinsic limitation on the court's inherent power of evidence preclusion which would enable preclusion in cases of evidence destruction, but leave the court powerless to remedy other forms of litigation abuse. Peat Marwick's conduct in this case, as the trial court found, has seriously damaged the People's case. Faced with this sort of abuse of the litigation process, the trial court may act to prevent the taking of an unfair advantage and to preserve the integrity of the judicial system. The court may invoke its inherent power to preclude a party's evidence on those aspects of its opponent's case which would have been presented in court by the now-compromised expert witness.

This conclusion finds ample support in numerous cases disqualifying law firms to prevent an unfair advantage or to avoid the appearance of impropriety (see, e.g., *William H. Raley Co.* v. *Superior Court* (1983) 149 Cal.App.3d 1042 [197 Cal.Rptr. 232]; *Chambers* v. *Superior Court* (1981) 121 Cal.App.3d 893 [175 Cal.Rptr. 575]), or disqualifying or enjoining the use of parties' experts for similar reasons. In *Conforti & Eisele* v. *Division of Bldg., etc.* (N.J.Super. 1979) 405 A.2d 487, the court enjoined the plaintiff's use of the defendant's engineering expert because the use would be "fundamentally unfair." (*Id.,* at p. 491.) "[The expert] was privy to confidential documents regarding the legal aspects of [the defendant's] claims, as well as the mental impressions, opinions and legal theories of [defendant's] counsel. Even if this information was not disclosed to [the plaintiff] *per se,* [the plaintiff] would still obtain the benefit of this confidential information be-

cause it would shape or effect, either consciously or unconsciously, the report [the expert] would render to [the plaintiff]. The very nature of the services which [the expert] provides makes it impossible to conceive of a situation in which [the expert] could conscientiously discharge its duty to [the plaintiff] as an expert while simultaneously discharging its duty to [defendant] not to divulge confidences and secrets which [defendant] has conveyed to [the expert]." (*Id.,* at p. 492.)

The *Conforti* decision was cited with approval by the Appellate Division in *Overlook Terrace Corp.* v. *Excel Properties* (1986) 210 N.J.Super. 420 [510 A.2d 68, 72], where the court indicated the injunctive power was appropriate, but declined to exercise it on a record which, unlike *Conforti's,* did not show a breach of confidence. The decision in *Conforti* was likewise endorsed by a United States magistrate in *Marvin Lumber & Cedar Co.* v. *Norton Co.* (D.Minn. 1986) 113 F.R.D. 588, 590. In that case a testing laboratory had a prior expert-litigant relationship with the plaintiff; the defendant obtained the lab as a consulting expert and the plaintiff moved for an injunction. The court granted the injunction and disqualified the expert, noting that "[a]s the *Conforti* court observed, there is no sound basis for application of any different rule on the sole rationale that an expert, rather than an attorney, is the subject of the motion." (*Id.,* at p. 591; see *Conforti & Eisele* v. *Division of Bldg., etc., supra,* 405 A.2d at p. 492; *Miles* v. *Farrell* (N.D.Ill. 1982) 549 F.Supp. 82.)[9]

■ Peat Marwick suggests the imposition of an order precluding evidence infringes upon a litigant's right to due process. We cannot accept the notion that due process of law entitles a litigant to present certain evidence after it has compromised its opponent's ability to counter that evidence with the sort of litigation abuse found in this case. In the higher-stakes context of a criminal trial, the United States Supreme Court has held that the defendant's Sixth Amendment right to present evidence on his or her own behalf—derived from the compulsory process clause—is not absolute. Although a criminal defendant's right to produce evidence is "a fundamental element of due process of law" (*Washington* v. *Texas* (1967) 388 U.S. 14, 19 [18 L.Ed.2d 1019, 1023, 87 S.Ct. 1920]), the Sixth Amendment "does not

---

[9]*Mills Land & Water Co.* v. *Golden West Refining Co.* (1986) 186 Cal.App.3d 116 [230 Cal.Rptr. 461] does not, as Peat Marwick suggests, support setting aside the trial court's order. *Mills Land* supports the People to the extent that it affirms an order disqualifying an attorney for conflict of interest and precluding him from communicating confidential information. To the extent *Mills Land* reverses an order disqualifying the attorney's entire firm, the case is distinguishable. The global disqualification in *Mills Land* was rejected as punitive because, in contrast to the case before us, there was no evidence the opposing party would be prejudiced by the firm's continued participation. *Mills Land* also concluded there was no basis for a finding of "continuing effect" of the conflict of interest, which is in contrast to the factual findings made in the instant case.

confer the right to present testimony free of the legitimate demands of the adversarial system." (*United States* v. *Nobles* (1975) 422 U.S. 225, 241 [45 L.Ed.2d 141, 155, 95 S.Ct. 2160].)

In *Nobles* the court upheld a preclusion order which excluded the testimony of a defense expert who had failed to permit discovery of a "highly relevant" report. More recently, the court upheld the preclusion of certain alibi testimony, imposed as a sanction for failing to reveal the names of two alibi witnesses in accordance with a discovery rule. (*Taylor* v. *Illinois* (1988) 484 U.S. 400 [98 L.Ed.2d 798, 108 S.Ct. 646].) The court ruled that preclusion orders were not absolutely barred by due process considerations, but could be imposed in appropriate cases to preserve "the integrity of the adversary process" and "the fair and efficient administration of justice." (*Id.,* at p. __ [98 L.Ed.2d at p. 814, 108 S.Ct. at p. 655].) If a preclusion order may be imposed upon the constitutional rights of a criminal defendant, the imposition of one upon a civil litigant, under appropriate circumstances, can hardly be a violation of due process.

 The trial court's preclusion order was well within its inherent authority.[10] It remains to determine whether the entry of the order constitutes an abuse of discretion on the record before us.

### B. *The Order Is Not an Abuse of Discretion*

 Given the trial court's specific—and essentially unchallenged—findings of fact, it is not difficult to conclude the preclusion order was well within the court's legitimate discretion to remedy an egregious wrong. Consequently, we need not discuss the issue at length.

Citing only discovery cases, Peat Marwick argues that a "drastic" sanction can only be imposed as a last resort after lesser sanctions have failed and after a finding of bad faith. Assuming this to be the correct law of discovery sanctions, the argument is again off the mark. The evidence preclusion order is not a discovery sanction, and there is no reason lesser sanctions must first be tried when the trial court is faced with a clear problem which only preclusion can remedy. (Cf. *Conforti & Eisele* v. *Division of Bldg., etc., supra,* 405 A.2d 487.) Given the trial court's findings of fact regarding the secret merger (and bearing in mind Main Hurdman's assurances to the People that no such merger was pending), economic self-interest and "meddling with the integrity of the judicial system," the claim there has been no finding of bad faith is at best disingenuous.

---

[10] The preclusion order in this case involves two of four elements in two of five causes of action levied against Peat Marwick. We express no opinion on the validity of a more severe preclusion order precluding all evidence on all causes of action.

Peat Marwick also contends the trial court's order is based only on the "speculative" possibility of actual harm. Peat Marwick points to a passage in a March 26 transcript where the court expressed a concern of "potential" for abuse and transfer of confidential information. From this Peat Marwick argues the entire order is based on "the Court's speculation that someone inadvertently *might* breach plaintiffs' confidences and thereby *might* give Peat Marwick some unspecified advantage in the litigation." (Italics by Peat Marwick.)

Aside from the fact that not all predictions are "speculation" and a court may act in advance to enjoin harm reasonably likely to occur, Peat Marwick's position is unsound. Again, the argument is based on an incorrect view of the facts. The trial court's June 22 order, *postdating* the transcript reference, concludes that it is "inconceivable" that confidential information has not been exchanged. The court also found the screening mechanism was inadequate, and that the People were compromised in their choice of an expert—a clear and present harm.

Peat Marwick concludes with the lament that its "inability to defend itself" is too harsh given the lack of any evidence that confidential information changed hands, given its screening mechanism, and the "fact" that the People have in any event "already disclosed voluntarily" the "substance" of Main Hurdman's conclusions. The first two points are defeated by the findings of fact; in addition, the People's return details the seriousness of Peat Marwick's conduct in harming the People's case and in fostering Main Hurdman's breach of its fiduciary duty to the People. The third is not factually correct. In connection with settlement efforts against *other* defendants below, the People disclosed Main Hurdman's report relating to the size of the deficit. This is pertinent only to the issue of damages, no longer covered by the preclusion order, and not to standard of care and negligence. A second letter proposing settlement to Peat Marwick did not mention Main Hurdman and only outlined legal theories of the People's case; the letter was excluded from evidence below on Peat's own objection. The letter also does not cure the problem of the expert's exposure to plaintiffs' litigation planning and information and then merging with Peat Marwick.

## IV. CONCLUSION

The preclusion order was well within the inherent power of the trial court and was a legitimate exercise of discretion. The court's action is thoughtful, well tailored to the evidence and eminently sound. Of course, we only hold the order was not an abuse of discretion in this case, and do not purport to establish criteria for the entry of preclusion orders in different factual contexts.

The alternative writ is discharged; the petition for extraordinary relief is denied. The People shall recover costs.

LOW, P. J.—I concur in the opinion of Justice Haning, but write separately to comment on the apparently widespread use of the term "Chinese Wall" to describe the type of screening mechanism discussed in this case. While our opinion uses the term "screen," both the parties and the trial court used the term "Chinese Wall," which seems to have become a term of art. I write to express my profound objection to the use of this phrase in this context.

The origin of the use of "Chinese Wall" in the context of confidentiality is unclear. Evidently, the term was casually coined in some appellate opinion, then picked up and used without question or explanation by courts and commentators. The unquestioned use of the term was perpetuated by a leading note on the subject, *The Chinese Wall Defense to Law-Firm Disqualification* (1980) 128 U.Pa.L.Rev. 677, which is otherwise analytical and informative. (See lead opn., fn. 2, p. 280.)

The enthusiasm for handy phrases of verbal shorthand is understandable. Occasionally, however, lawyers and judges use a term which is singularly inappropriate. "Chinese Wall" is one such piece of legal flotsam which should be emphatically abandoned. The term has an ethnic focus which many would consider a subtle form of linguistic discrimination. Certainly, the continued use of the term would be insensitive to the ethnic identity of the many persons of Chinese descent. Modern courts should not perpetuate the biases which creep into language from outmoded, and more primitive, ways of thought.

It may be sobering to recall that little more than a century ago our own Supreme Court held that persons of Chinese ancestry could not testify in court against a person of Caucasian descent. In *People* v. *Hall* (1854) 4 Cal. 399, 404, the court, speaking through Chief Justice Hugh C. Murray, declared that "[t]he same rule which would admit them to testify, would admit them to all the equal rights of citizenship, and we might soon see them at the polls, in the jury box, upon the bench, and in our legislative halls." It is worth noting, given recent events on the American political stage, that language and attitudes once embodied in a judicial opinion would now lead to the removal of a Governor, and membership in groups adhering to those attitudes could lead to denial of confirmation for high public office.

Aside from this discriminatory flavor, the term "Chinese Wall" is being used to describe a barrier of silence and secrecy. The barrier itself may work to further the cause of ethics in litigation; but the term ascribed to that barrier will necessarily be associated with constraints on the freedom of open communication. To employ in this context the image of the Great Wall of China, one of the magnificent wonders of the world and a structure of great beauty, is particularly inappropriate. One can imagine the response to the negative use of the images of the Eiffel Tower, the Great Pyramid of Cheops, or the Colossus of Rhodes.

Finally, "Chinese Wall" is not even an architecturally accurate metaphor for the barrier to communication created to preserve confidentiality. Such a barrier functions as a hermetic seal to prevent two-way communication between two groups. The Great Wall of China, on the other hand, was only a one-way barrier. It was built to keep outsiders out—not to keep insiders in.

It is necessary to raise a clenched cry for jettisoning the outmoded legal jargon of a bygone time. If the image of a wall must be used, perhaps "ethics wall" is more suitable phraseology.

**KING, J.**—I concur in the result because Peat Marwick's petition challenges the trial court's order of April 17, and this order was mooted by the trial court's subsequent order of June 22. Our Supreme Court directed us to issue an alternative writ apparently not perceiving that the petition before it challenges an order which had been mooted by a later order. Peat Marwick has filed no challenge to the June 22 order and the Supreme Court's direction to issue an alternative writ on Peat Marwick's challenge to the April 17 order applies only to that order.

A petition for a rehearing was denied May 13, 1988, and petitioner's application for review by the Supreme Court was denied July 28, 1988.