Filed 4/7/25  Ross v. Trustees of California State University CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| CRAIG ROSS et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>TRUSTEES OF CALIFORNIA STATE UNIVERSITY,<br><br>    Defendant and Respondent. | B317031<br><br>(Los Angeles County Super. Ct. No. SC125558) |

APPEAL from a judgment and orders of the Superior Court of Los Angeles County, James A. Kaddo, Judge.  Affirmed.

Craig Ross and Natalie Operstein, in pro. per., for Plaintiffs and Appellants.

Rob Bonta, Attorney General, Chris A. Knudsen, Assistant Attorney General, Gary S. Balekjian and Lorinda D. Franco, Deputy Attorneys General, for Defendant and Respondent.

_____

This is an appeal from a judgment, which followed an order of nonsuit, orders sustaining demurrers without leave to amend, and other related orders.

**BACKGROUND**

The factual record in this case is extensive. We begin with a general background and discuss additional facts as relevant to our analysis in the discussion section, below.

Plaintiff Operstein is a linguistics scholar with numerous publications to her name. She holds a doctorate in Indo-European studies from University of California Los Angeles and has taught over 100 undergraduate and graduate level courses on various topics in linguistics. This litigation arises from her stint as a professor of linguistics at California State University, Fullerton (CSUF), which is part of the California State University (CSU) system. Defendant Trustees of California State University controls CSU. Plaintiff Ross is Operstein's husband.

Operstein's employment at CSUF began in 2011 when she accepted a full-time tenure track appointment for the 2011-2012 and 2012-2013 academic years. This two-year appointment was "probationary," meaning that any subsequent reappointments would be conditioned on her job performance. Operstein's appointment letter specified that performance reviews would be made pursuant to a collective bargaining agreement and a CSUF statement of faculty personnel policy and procedures designated "UPS 210.000." These policies and procedures govern, among other things, retention, tenure and promotion (RTP) of probationary faculty members. UPS 210.000 provides that RTP decisions are further governed by Department Personnel Standards (DPS). Together, these standards require a probationary faculty member to perform at an adequate level in

2

three broad review categories: (1) teaching, (2) scholarship, and (3) professional, CSUF, and community service.

During her initial probationary term, Operstein was offered, and accepted, reappointment for the 2013-2014 academic year—her "third probationary year." Shortly after the start of that academic year, she applied for early tenure. Dr. José Cruz, then CSUF's provost and vice president for academic affairs, denied her application. In a May 2014 letter, Dr. Cruz noted her portfolio was "incomplete" and "d[id] not adhere to the requirements" of the applicable DPS. Specifically, Operstein had "failed to provide 'reports of two classroom observations made by tenured faculty members'" and exceeded the applicable word limits in her self-assessment narratives. He admonished her to "adhere to all DPS requirements" when preparing future portfolios.

In addition to her application's procedural shortcomings, Dr. Cruz indicated Operstein was deficient "in the area of service," one of the tenure review categories, and advised her to "develop clearly defined objectives for [her] involvement in professional, [CSUF], and/or community activities and [to] approach the work in a collegial manner." He recognized Operstein was making "good progress" in the other two review categories through her teaching and scholarly research.

Despite the shortcomings noted, Dr. Cruz offered, and Operstein accepted, reappointment for the 2014-2015 academic year on an ongoing probationary basis. This would be the last such reappointment.

Operstein again applied for early tenure in October 2014. Her original application deadline was October 1, but CSUF granted her three extensions, cumulatively to October 28.

3

Despite the extra time, and despite Dr. Cruz's admonition in the May 2014 letter, Operstein again submitted a portfolio that did not comply with applicable DPS requirements. By a June 2015 letter, Dr. Cruz rejected Operstein's early tenure application and offered her only a "terminal year" reappointment—meaning no possibility of future appointments—for the 2015-2016 academic year. Dr. Cruz cited several reasons for his decision. In addition to the deficiencies in her portfolio, Operstein failed to provide evidence of growth in the three areas of review, did not address concerns about collegiality, and continued to demonstrate uncollegial behavior, even through the review process. Operstein accepted the terminal year appointment.

Nearing the end of her terminal year appointment, Operstein, together with her husband Ross, sued defendant. Their initial complaint asserted 20 causes of action. Following a series of demurrers, motions to strike, and amendments, defendants finally answered plaintiffs' third amended complaint in August 2019. By that time, 11 causes of action remained operative. These were, (a) by Ross, for loss of consortium; and (b) by Operstein, causes of action for promissory estoppel, wrongful termination, defamation, negligent infliction of emotional distress, negligence, negligent hiring, violation of Labor Code section 970, invasion of privacy, violation of Business and Professions Code section 17200, and violation of the Fair Employment and Housing Act (FEHA, Gov. Code, § 12900 et seq.).

In June 2021, plaintiffs moved to amend their third amended complaint. They wanted to add allegations in support of Operstein's FEHA cause of action that she was replaced by an "Asian male" hired three years after her CSUF employment

4

ended.  These allegations were at odds with Operstein's original FEHA theory, that she was a victim of defendant's "Hispanicization" policy by which Operstein was replaced with "a Hispanic male" because she was non-Hispanic.  The trial court denied plaintiffs' motion.

Shortly before trial, plaintiffs voluntarily withdrew some of their remaining claims.  They proceeded to trial on Operstein's causes of action for defamation, negligent infliction of emotional distress, negligence, negligent hiring, violation of Labor Code section 970, invasion of privacy, and violation of FEHA; and Ross's cause of action for loss of consortium.

The court decided various motions in limine and ordered the proceedings bifurcated on liability and damages.  Only if Operstein proved liability on her causes of action would there be further proceedings on damages and Ross's cause of action for loss of consortium.

In presenting her case, Operstein called no witness other than herself and Ross.  She testified for approximately five days under her own direct examination.  After she rested, defendant played a video deposition of Dr. Cruz.  Defendant then moved for a nonsuit.  The trial court granted defendant's motion.  As a result, there were no further proceedings on damages or on Ross's cause of action for loss of consortium.  The trial court entered judgment for defendant on October 12, 2021.

Prior to and during the course of the trial, plaintiffs filed three statements of disqualification of the trial judge for cause pursuant to Code of Civil Procedure sections 170.1 and 170.3, subdivision (c).  The trial court struck and denied each statement. The plaintiffs' various pleas for relief to higher courts were unsuccessful.

5

Plaintiffs timely appealed the trial court's judgment of nonsuit.

## DISCUSSION

### 1.  Plaintiffs' Attacks on the Trial Judge

Because plaintiffs contend it is dispositive of or affects our review as to other issues, we address first their arguments that Judge Kaddo was incompetent and impartial.  As just noted, plaintiffs filed three statements of disqualification of the trial judge and unsuccessfully sought appellate review of two of them. By statute, appellate review of asserted disqualification grounds is available only by writ of mandate.  (Code Civ. Proc., § 170.3, subd. (d).)  But "notwithstanding the exclusive-remedy provision of Code of Civil Procedure section 170.3, 'a defendant may assert on appeal a claim of denial of the due process right to an impartial judge.' " (*People v. Panah* (2005) 35 Cal.4th 395, 445, fn. 16.)

#### a.  Standard of review

Whether the proceedings below satisfy plaintiffs' right to due process is a question of law we review de novo. (*Conservatorship of Christopher A.* (2006) 139 Cal.App.4th 604, 609-610.)

#### b.  Analysis

Plaintiffs correctly assert that due process " 'minimally contemplates the opportunity to be fully and fairly heard before an impartial decisionmaker.' " (Quoting *Catchpole v. Brannon* (1995) 36 Cal.App.4th 237, 245, overruled in part by *People v. Freeman* (2010) 47 Cal.4th 993.)  To establish a violation of this right, " ' "there must exist ' "the probability of actual bias on the part of the judge." ' " ' " (*People v. Peoples* (2016) 62 Cal.4th 718, 787.)  A "mere appearance of bias" is not sufficient.  (*People v.*

6

*Freeman,* at p. 1000.) "[I]t is the exceptional case presenting extreme facts where a due process violation will be found." (*Id.* at p. 1005.)

Plaintiffs claim that purported "[i]rregularity of proceedings," "failure to follow rules and appearance of whimsical disregard of statutes, and questionable decisions," "judicial impatience," and an "[a]ppearance of . . . hostile attitude toward and rudeness during the presentation of plaintiff Operstein's case" (boldface omitted) demonstrate bias against plaintiffs based on their pro se status and Operstein's Jewish faith. Though they offer record citations for these alleged defects in the proceedings, they generally fail to discuss what the citations are to or how it is we could conclude those citations support their claims. We decline to do plaintiffs' work for them. (See *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830.)

In the rare instance where they do explain the citation, it does not support the assertion. There is no evidence in the record of "reported ties [of Judge Kaddo] to the Hezbollah terrorist group." Instead, a 2004 news article about a personal dispute between Judge Kaddo and his former son-in-law says the following: "[The former son-in-law] made a number of what Kaddo's attorney, Theodore Cohen, called 'crazy allegations,' including a claim that the Lebanese-born Kaddo is tied to the terrorist group Hezbollah." (Ofgang, *C.A. Orders New Hearing on Harassment Claim Against Judge Kaddo*, Metropolitan News-Enterprise (Mar. 12, 2004).) This is a far cry from how plaintiffs characterize it.

Plaintiffs also catalog a number of decisions and other actions they say showed impartiality, including purported ex parte communications with defendant's counsel and evidentiary

7

rulings and trial management decisions adverse to plaintiffs. Again, these claims are undeveloped and under-supported. For example, the ex parte communication claim refers to a transcript in which Operstein asked Judge Kaddo, after he expressed understanding of a point by defense counsel, "[w]ere there any ex parte communications between you? How do you know about [that]?" Judge Kaddo replied that the information was in defendant's filed papers. Plaintiffs fail to acknowledge this in their brief, much less show that the point was *not* in defendant's papers.

Moreover, the claimed defects in the proceedings would not establish a probability of bias. A trial court's rulings against a party, even if erroneous, do not, by themselves, support a charge of bias. (See *People v. Pearson* (2013) 56 Cal.4th 393, 447.) Similarly, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." (*Liteky v. United States* (1994) 510 U.S. 540, 555.) And ex parte communication, without more, is not disqualifying. (See *People v. Peoples*, *supra*, 62 Cal.4th at pp. 785-787 [multiple ex parte communications did not demonstrate a substantial probability of bias].)

We reject plaintiffs' claims they were denied the right to a hearing before an impartial decisionmaker.

## 2. Demurrers

### a. Standard of review

A demurrer tests the legal sufficiency of the complaint. We review the complaint de novo to determine whether it alleges facts sufficient to state a cause of action. For purposes of review, we accept as true all material facts alleged in the complaint, but

8

not contentions, deductions or conclusions of fact or law. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

When a demurrer is sustained without leave to amend, "we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm." (*Blank v. Kirwan*, *supra*, 39 Cal.3d at p. 318.) Plaintiff has the burden to show a reasonable possibility the complaint can be amended to state a cause of action. (*Ibid.*)

> **b.    Analysis**
>
> **i.        Breach of contract**

The trial court properly sustained defendant's demurrer, without leave to amend, to Operstein's breach of contract cause of action. Plaintiffs allege Operstein was contractually entitled to promotions and lifetime employment by virtue of her subjective opinion that she satisfied the requirements for tenure under UPS 210.000 and the DPS, each of which was referenced in her appointment letter. We disagree.

In general, California public employment is held not by contract, but by statute. (*Kim v. Regents of University of California* (2000) 80 Cal.App.4th 160, 164 (*Kim*).) This general principle applies to civil service and noncivil service public employees alike. (*Ibid.*) But this is not to say that public employees and public employers are barred from entering into contracts. (*Retired Employees Association of Orange County, Inc. v. County of Orange* (2011) 52 Cal.4th 1171, 1182.) A letter offering a professorship appointment for a limited term, like the one Operstein accepted, was treated as a contract in *Starsky v. Board of Trustees* (1973) 34 Cal.App.3d 310, 314-315. In that

9

case, the court held the professor was entitled to be appointed for the full term—one year—that he had accepted, notwithstanding the university's attempt to rescind its offer for cause. (*Id.* at pp. 316-617.) Notably, the university had failed to follow its own procedures in attempting to rescind the agreement. (*Id.* at p. 315.)

Here, defendant offered, and Operstein accepted, successive appointments for limited terms of employment. These offered her no right to employment beyond the stated terms. It has long been the rule that a nontenured faculty member who is not rehired after her contract of employment expires has no legitimate claim of entitlement to continued employment. (*King v. Regents of University of California* (1982) 138 Cal.App.3d 812, 815-816 [no due process right to adversary hearing upon professor's removal from tenure track].) Operstein's appointment letters made clear they contained no promise of future employment. By their plain terms, her employment was "probationary" for the first four years and "terminal" in the final year.

The only bases on which Operstein claims a right to future employment are the policies referenced in her employment letters—the UPS 210.000 and the DPS—which she claims gave her an "enforceable expectation[] of employment security." These policies do not promise future employment. They offer a path to future employment upon the satisfaction of the criteria set forth therein, based upon the judgment of her evaluators. Operstein cannot assert a contract cause of action on these policies for two reasons.

First, the policies Operstein alleges defendant violated are made pursuant to statute. (See Ed. Code, § 89500.) As such,

10

they have the force and effect of statutes.  (*Kim*, *supra*, 80 Cal.App.4th at p. 165.)  To the extent the terms of public employment are governed by statute, "insofar as the duration of such employment is concerned, no employee has a vested contractual right to continue in employment beyond the time or contrary to the terms and conditions fixed by law."  (*Miller v. State of California* (1977) 18 Cal.3d 808, 813.)  Operstein's probationary contracts entitled her to fixed terms of employment only and she never had any contractual right to employment beyond those terms.

Second, regardless of the source of the claimed rights, it is not the province of courts to determine whether a professor is entitled to tenure.  (*Pomona College v. Superior Court* (1996) 45 Cal.App.4th 1716, 1726.)  The rule of *Pomona College* applies equally to public and private universities.  (See *Pollack v. Univ. of So. Cal.* (2003) 112 Cal.App.4th 1416, 1421, citing *Pomona College*, at pp. 1722-1724 & 1726.)  Contrary to Operstein's allegations in her complaint, whether to grant tenure is an inherently subjective determination entailing considerable judgment.  This is true even where the factors for consideration are stated objectively.  (*McGill v. Regents of University of California* (1996) 44 Cal.App.4th 1776, 1787.)  And, factors outside of the stated policies may properly inform that judgment.  (*Ibid.*; see also *Pomona College*, at p. 1724.)  As explained in *Pomona College*, "[o]nly one group of people is suited to undertake the responsibility of making these decisions:  the candidate's academic peers who are knowledgeable about the candidate's chosen field of study and about the particular needs of the institution.  These peers, unlike nonacademics, are equipped to evaluate the candidate's teaching and research

11

according to their conformity with methodological principles agreed upon by the entire academic community.  They also have the knowledge to meaningfully evaluate the candidate's contributions within his or her particular field of study as well as the relevance of those contributions to the goals of the particular institution.  Moreover, because their individual academic reputations are intertwined with that of the university, the candidate's peers have the greatest stake in choosing people whose future work will reflect favorably on the institution." (*Pomona College*, at p. 1726, fn. omitted.)  A cause of action for breach of contract challenging a tenure decision is therefore properly subject to demurrer (*id.* at pp. 1727, 1730-1731) and plaintiffs cannot show Operstein could overcome this bar through amendment.

Though Operstein's contract cause of action to affirmatively establish a right to tenure is not viable, we note that Operstein remained free to, and did, challenge denial of tenure under her illegal discrimination theories.  (*Pomona College, supra*, 45 Cal.App.4th at p. 1724 & fn. 4.)  Those are addressed in part 5.b.iv., *post*.

ii.     **Wrongful termination in violation of public policy**

The trial court properly sustained defendant's demurrer, without leave to amend, to Operstein's cause of action for wrongful termination in violation of public policy.  Operstein's cause of action was based on allegations that defendant was engaged in a policy of replacing Caucasian employees with Hispanic and Asian employees in violation of policies expressed in the California Constitution and statutory law.  Plaintiffs refer to this alleged policy as "ethnic cleansing."

12

In sustaining the demurrer, the trial court concluded defendant enjoyed immunity from common law torts under Government Code section 815 and *Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876 (*Miklosy*). Like the defendant in *Miklosy*, defendant here is a public entity for purposes of section 815. (§ 811.2.) Section 815 eliminated common law liability for public entities, and wrongful termination is a common law tort within the section's purview. (*Miklosy*, at pp. 899-900; see also *Ross v. San Francisco Bay Area Rapid Transit Dist.* (2007) 146 Cal.App.4th 1507, 1517.)

Plaintiffs cite *Los Angeles County Professional Peace Officers' Association v. County of Los Angeles* (2008) 165 Cal.App.4th 63, 73 as standing for the proposition that "wrongful termination in violation of public policy based on constitutional or statutory violations is not a common [*sic*] tort and can be stated against public entities." But *Los Angeles County Professional Peace Officers' Association* "[wa]s not a suit for damages on a common law tort, but an action under [Labor Code] section 4850, which governs the County's treatment of deputy sheriffs who are injured on duty." (*Ibid.*) As such, *Miklosy* did not control in that case (*ibid.*), but it does here.

Plaintiffs cite several other cases for the proposition that "[claims] for wrongful termination of public employees in violation of public policy prohibiting discrimination were upheld." But each of these cases predated *Miklosy* and therefore did not examine immunity under *Miklosy*. Indeed, *Miklosy* expressly limited plaintiffs' primary authority, *City of Moorpark v. Superior Court* (1998) 18 Cal.4th 1143. While *Miklosy* acknowledged *Moorpark* held "an employee could bring a [wrongful termination in violation of public policy] cause of action for disability

13

discrimination," and "[t]he defendant in [*Moorpark*] happened to be a public entity," it explained "the question of a public entity's tort immunity under [Government Code] section 815 was not raised in that case. 'It is axiomatic that cases are not authority for propositions not considered.' " (*Miklosy*, *supra*, 44 Cal.4th at p. 900, fn. 7.)

Plaintiffs argue Government Code section 815.6 creates an exception from section 815 immunity in this case. Section 815.6 subjects a public entity to liability for injuries proximately caused by its unreasonable failure to discharge a mandatory duty designed to protect against the risk of the particular injuries caused. Plaintiffs assert defendant's alleged constitutional violations fall within the exception of section 815.6 because section 26 of the California Constitution makes all constitutional provisions "mandatory." This blanket provision does not create a private right of action against public entities for every claimed constitutional violation. (*Clausing v. San Francisco Unified School Dist.* (1990) 221 Cal.App.3d 1224, 1236.)

On reply, plaintiffs argue for the first time that they stated a claim under section 31 of article I of the California Constitution. However, they fail to explain why they did not make this argument in their opening brief so that defendant could respond. We will not consider plaintiffs' tardy argument. (See *American Indian Model Schools v. Oakland Unified School Dist.* (2014) 227 Cal.App.4th 258, 275-276.)

### iii. Ross's causes of action other than loss of consortium

The trial court properly sustained defendant's demurrer, without leave to amend, to Ross's causes of action other than his claim for loss of consortium. It did so on the basis that Operstein,

14

not Ross, was the person to whom defendant's alleged wrongful conduct was directed.

Plaintiffs argue Ross had standing coextensive with Operstein's by virtue of their marital relationship and the prospect of a recovery to the marital community. We disagree. The court in *Hatchwell v. Blue Shield of California* (1988) 198 Cal.App.3d 1027 held that a wife's community property interest in her husband's benefits under an insurance policy did not give the wife standing to sue either as a party or a third party beneficiary for contract or tort damages arising out of the insurance company's failure to pay her husband's medical benefits. (*Id.* at p. 1036.) That principle applies here.

We are similarly unpersuaded by Ross's argument he has standing as a third party beneficiary of Operstein's employment contract. For reasons already mentioned, plaintiffs failed to allege a cognizable breach of contractual obligations owed to Operstein.

Finally, we have reviewed the arguments and authorities plaintiffs say establish Ross's standing as "one whose benefits were wrongfully denied," as a " '[d]irect victim,' " as a bystander suffering emotional distress, and as a surrogate for Operstein under *Powers v. Ohio* (1991) 499 U.S. 400. We find none of these theories applicable to establish standing of the spouse of an allegedly wrongfully terminated employee to join in the employee's causes of action against the employer.

Plaintiffs do not show that Ross could amend the third amended complaint to establish standing on his non-loss-of-consortium causes of action.

3.     **Denial of Leave to Amend Third Amended Complaint**

We review for abuse of discretion the trial court's denial of

plaintiffs' motion for leave to amend their third amended complaint. (*Manderson-Saleh v. Regents of the University of California* (2021) 60 Cal.App.5th 674, 707.) Plaintiffs fail to show the trial court abused its discretion.

Plaintiffs filed their third amended complaint in January 2019. Defendant answered in August 2019. Plaintiffs moved to amend on June 22, 2021, with their trial scheduled to commence a month later. The court heard the matter on an advanced hearing date in order to determine it prior to trial. Plaintiffs wanted to add allegations that Operstein had been replaced by an Asian male. The allegations of the third amended complaint were that she had been replaced by a Hispanic male. According to their motion, plaintiffs obtained "definitive evidence" (underscoring omitted) Operstein had been replaced by an Asian male in April 2021, two months before they filed their motion. Their proposed amendment included the allegation that Operstein "was terminated and replaced by . . . a younger male Hispanic, who was hired on a tenure-track contract concurrently with termination of Dr. Operstein's tenure-track contract. She was also replaced . . . by a male Asian who was hired after her termination." (Underscoring omitted.)

We are directed to the minute order stating the trial court's denial of plaintiffs' motion but that the transcript of the hearing was not transcribed. Plaintiffs say the trial court did not explain why it denied the motion. Without a record citation, defendant says the trial court deemed the amendment untimely and irrelevant to Operstein's claim she suffered disparate treatment because of a "Hispanicization" policy.

Without a record citation directing us to information about the trial court's exercise of discretion beyond its bare denial

16

reflected in the minute order,  we are provided an inadequate basis to review the trial court's exercise of discretion.  (See *Wagner v. Wagner* (2008) 162 Cal.App.4th 249, 259 [discussing limits of abuse of discretion review in absence of adequate record]; *Baranchik v. Fizulich* (2017) 10 Cal.App.5th 1210, 1227 ["Arguments, concessions, and offers of proof made during the hearing are relevant to a determination of whether the trial court abused its discretion by denying leave to amend."].)

### 4.    Evidentiary Rulings

Plaintiffs challenge the trial court's denial of several motions in limine they filed and its grant of several motions in limine defendants filed.

#### a.    Standard of review

" ' "A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' [Citation.]  It is the appellant's ' "burden to establish such an abuse, which we will find only if the trial court's order exceeds the bounds of reason." ' [Citation.]  An ' "erroneous evidentiary ruling requires reversal only if 'there is a reasonable probability that a result more favorable to the appealing party would have been reached in the absence of the error.' " ' " (*K.M. v. Grossmont Union High School Dist.* (2022) 84 Cal.App.5th 717, 760.)

#### b.    Analysis

Plaintiffs' opening brief contains only a cursory assertion of error as to the challenged rulings.  Plaintiffs generally fail to identify the governing evidentiary rule, provide any detail of the animating facts, or offer any analysis or authority by which we

17

could find error.  And, they generally fail to explain how each challenged ruling might have resulted in a different outcome.

Challenges to evidentiary rulings are subject to the usual rule that points not supported by argument and citation to authority are forfeited.  (See *Salas v. Dept. of Transportation* (2011) 198 Cal.App.4th 1058, 1074.)  Further, " '[w]e are not required to search the record to ascertain whether it contains support for [plaintiffs'] contentions.' " (*Ibid.,* first brackets added.)  We therefore address only those points as to which we can ascertain from plaintiffs' opening brief the applicable rule they contend the trial court violated, why they believe the court violated it, and how it is reasonably probable the outcome would have been different if no such violation had occurred.

Plaintiffs contend the trial court erred in granting nine of defendant's motions in limine because they did not comply with the declaration requirement of Los Angeles Superior Court Local Rules, rule 3.57(a).  Elsewhere, plaintiffs contend that the grant of some of these motions resulted in a manifest miscarriage of justice.  Plaintiffs provide only a record citation to defendant's purportedly deficient motions in limine, which refer extensively to declarations.  Defendant notes this fact in its respondent's brief and plaintiffs do not revisit the issue in their reply.  We have no basis on which to find error on this record.

Plaintiffs contend the trial court erred in excluding their opinions on Operstein's academic performance, specifically her eligibility for tenure under the RTP and DPS.  With citations only to Operstein's curriculum vitae, the qualifications section of her purported expert report, and a declaration by Ross, they assert they are both qualified to render expert opinions on this issue.

A person qualifies as an expert under Evidence Code

section 720, subdivision (a) "if he has special knowledge, skill, experience, training or education sufficient to qualify him as an expert on the subject to which his testimony relates." Plaintiffs' contention that they are qualified to testify as experts about Operstein's academic performance as it relates to CSU's tenure standards states only a disagreement with the trial court's conclusion. This is insufficient to show error. (See *San Francisco Print Media Co. v. The Hearst Corp.* (2020) 44 Cal.App.5th 952, 962 [abuse of discretion arises where no reasonable person could agree with trial court's decision; it is insufficient even that the appellate court disagrees].)

Further, the cited evidence reveals no expertise by either plaintiff in making academic tenure decisions. It does show both plaintiffs have experience in academia. Operstein has presented, published, and taught extensively in the field of linguistics. Ross taught various topics in mathematics to business students in Canada in the 1990's. But expertise in an academic field or even as a university professor or other instructor does not conclusively establish expertise in assessing a faculty member for tenure. "The competency of an expert is relative to the topic and fields of knowledge about which the person is asked to make a statement. In considering whether a person qualifies as an expert, the field of expertise must be carefully distinguished and limited." (*People v. King* (1968) 266 Cal.App.2d 437, 445.) We cannot conclude the trial court's determination that plaintiffs did not qualify as experts in an area they had no demonstrated experience was so irrational or arbitrary that no reasonable person could agree with it.

Finally, though plaintiffs utterly fail to support or explain why it was error, we address their assertions that the trial court

19

excluded "*all* of plaintiffs [*sic*] exhibits" and entered an "[o]rder precluding introduction of all exhibits into evidence before the grant of nonsuit." A review of the transcript plaintiffs cite reveals no such orders. The trial court refused to allow plaintiffs to use their 2,722 exhibits that had not been marked, labeled, and organized as required by the court's pretrial order and local rules and which defense counsel had repeatedly requested in advance of trial. However, the trial court did not exclude all of plaintiffs' exhibits. Rather, it allowed plaintiffs to introduce as their own those exhibits that were in defendant's binder— exhibits which apparently overlapped considerably with plaintiffs' exhibits. Courts have broad authority to manage trials and ensure compliance with court orders and rules. A trial court's "inherent power to curb abuses and promote fair process extends to the preclusion of evidence" at trial. (*Peat v. Superior Court* (1988) 200 Cal.App.3d 272, 288.) Plaintiffs fail to show that the complained of orders were actually made, much less that the ones that were made exceeded the trial court's authority.

5. **Nonsuit**

  a. **Standard of review**

  "Nonsuit for a defendant is proper if a plaintiff presents insufficient evidence on an element of the case [citations], or if the plaintiff's evidence establishes an affirmative defense that defeats the cause of action." (*Breazeal v. Henry Mayo Newhall Mem'l Hosp.* (1991) 234 Cal.App.3d 1329, 1337.) The trial court must give the plaintiff's evidence " ' "all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in [the] plaintiff['s] favor." ' [Citation.] A mere 'scintilla of evidence' does not create a conflict for the jury's resolution; 'there must be *substantial evidence* to

20

create the necessary conflict.' " (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291.)

"We independently review the trial court's decision to grant a nonsuit, using the same standard employed by the trial court." (*Lund v. Bally's Aerobic Plus* (2000) 78 Cal.App.4th 733, 737.)

### b.    Analysis

As a preliminary matter, plaintiffs note review is limited to grounds stated in the motion. This is correct (*Medina v. St. George Auto Sales, Inc.* (2024) 103 Cal.App.5th 1194, 1208-1209), but plaintiffs misapply the rule. The *notice* of motion states there was insufficient evidence to support Operstein's causes of action, compelling judgment for defendant on both her and Ross's causes of action. But the motion expands on this to address immunity. All grounds stated in the motion and relied upon by the trial court are a proper subject of our review. (See *Jacob v. Watson* (1931) 113 Cal.App. 299, 301.)

### i.    Common law tort causes of action

The trial court granted nonsuit as to Operstein's common law tort causes of action on, among other grounds, Government Code section 815 immunity. In its respondent's brief, defendant argues this embraces Operstein's causes of action for negligence, negligent hiring and supervision, negligent infliction of emotional distress, and invasion of privacy. Plaintiffs respond that three exceptions to immunity apply:  sections 815.6, 815.2 and 815.4. We disagree.

As discussed above, Government Code section 815.6 subjects a public entity to liability under limited circumstances for violating a mandatory duty imposed by statute. Plaintiffs say UPS 210.000 and the DPS imposed on defendant a mandatory duty to reappoint Operstein and grant her tenure because, in

21

Operstein's subjective opinion, she satisfied the applicable requirements. This is not so.

Not every statute governing a public entity's conduct gives rise to a mandatory duty. " '[T]he enactment at issue [must] be *obligatory*, rather than merely discretionary or permissive, in its directions to the public entity; it must *require*, rather than merely authorize or permit, that a particular action be taken or not taken.' [Citation.] 'It is not enough, moreover, that the public entity or officer have been under an obligation to perform a function *if the function itself involves the exercise of discretion.*' " (*State Dept. of State Hospitals v. Superior Court* (2015) 61 Cal.4th 339, 348.)

Plaintiffs do not identify the specific provisions of UPS 210.000 and the DPS they think compel defendant to give her tenure. It is impossible for us to conclude the trial court erred in finding no violation of a mandatory duty without being directed to the purported mandate. In any event, defendant was under no mandatory duty to reappoint or grant tenure to Operstein because its decisions in this regard are inherently discretionary. (*Pomona College*, *supra*, 45 Cal.App.4th at pp. 1724-1725.)

Plaintiffs' claimed exceptions to immunity under Government Code sections 815.2 and 815.4 similarly fail. These provisions render a public entity liable for certain acts by their employees or contractors. (§§ 815.2, subd. (a), 815.4.) No such immunity ordinarily attaches where the employee, or contractor if it were an employee, would also be immune. (§§ 815.2, subd. (b), 815.4.) Public employees are generally immune from liability for, among others, acts taken in the exercise of discretion vested in them, even if abused. (§ 820.2.) Again, the decisions

relating to Operstein's appointment and tenure eligibility are inherently discretionary.

### ii.     Labor Code section 970

The trial court granted nonsuit as to Operstein's Labor Code section 970 cause of action on, among other grounds, Government Code section 818.8 immunity.

Labor Code section 970 imposes liability on persons who, by the misrepresentations of their agents or officers, induce a person to move for new employment by means of knowingly false representations about certain enumerated characteristics of the prospective job. (*Ibid*.) Government Code section 818.8 provides that public entities are not liable for injuries caused by their employees' misrepresentations. (Gov. Code, § 818.8.)

In *Burden v. County of Santa Clara* (2000) 81 Cal.App.4th 244, the court held that Government Code section 818.8 immunity barred, as a matter of law, a Labor Code section 970 cause of action asserted by a former public employee against his former public entity employer. (*Burden v. County of Santa Clara,* at p. 253.) Here, the trial court correctly found defendant is therefore immune to liability for Operstein's Labor Code section 970 cause of action.

### iii.     Defamation

The trial court granted nonsuit as to Operstein's defamation cause of action on, among other grounds, that the purportedly defamatory statements were statements of opinion and also privileged because they were made by supervisors acting within the scope of their duties.

Plaintiffs contend Dr. Sheryl Fontaine, dean of the CSUF College of Humanities and Social Sciences, defamed Operstein by making various statements critical of Operstein's job

23

performance in an internal CSUF e-mail which was later used as a basis for Operstein's termination. In their reply, they also claim Dr. Franz Mueller, whose title the record shows as "Chair, Department Personnel Committee," defamed Operstein when he called her "arrogant"—a statement he apparently made in another internal CSUF e-mail from Dr. Mueller to Operstein's dean.

Defendant responds that assessment of coworker performance is privileged under Civil Code section 47, subdivision (c), often called the "common interest privilege." (See CACI No. 1723.) In relevant part, section 47, subdivision (c) makes privileged "a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information." (§ 47, subd. (c).) Defendant cites *McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510 and *Gutkin v. University of Southern California* (2002) 101 Cal.App.4th 967 as making this privilege applicable here. In each case, the privilege barred defamation claims by terminated employees against their former coworkers or employers for statements made in connection with the plaintiffs' terminations.

In their opening brief, plaintiffs argued no privilege applied because Dr. Fontaine was not Operstein's supervisor when she made the purportedly defamatory statements. Operstein so testified at trial. It is not clear from the allegations of their third amended complaint, however, that Drs. Fontaine and Mueller were not her supervisors. On the one hand, plaintiffs alleged

24

"Dr. Operstein was harassed by her supervisors and CSU employees and officials placed in, or who have assumed, the position of her supervisors, including . . . Fontaine [and] Mueller." Elsewhere, however, they say "Fontaine lacked any supervisory power over Dr. Operstein to force Dr. Operstein into meetings with her"; "Fontaine had no supervisory power over Dr. Operstein"; and that her "male harasser"—presumably Dr. Mueller—was "a non-supervisory employee."

In any event, it does not seem to matter whether or not Dr. Fontaine was Operstein's supervisor when she made the statements because the privilege is not limited to statements by supervisors about their reports. (See, e.g., *Warfield v. McGraw-Hill, Inc.* (1973) 32 Cal.App.3d 1041, 1046 [derogatory report about employee of advertising agency by magazine publisher's employees to advertiser, resulting in advertising agency employee's termination, was privileged].)

On reply, plaintiffs take a different tack, arguing the malice exception was satisfied. As to Dr. Mueller calling Operstein arrogant to her dean, they assert this statement was "made with the malicious purpose of harassment on the basis of sex." As to Dr. Fontaine's statements, they assert malice based on Operstein's national origin, that Operstein filed a harassment complaint, and that Dr. Fontaine wanted Operstein terminated. Plaintiffs add Dr. Fontaine lacked a reasonable ground for asserting Operstein "cannot engage in conversations" because they had had "extensive conversations and joint work" in the past.

Besides raising these arguments for the first time on reply, plaintiffs offer no record citations to support them. Without pointing to evidence establishing the grounds for actual or

25

inferred malice, plaintiffs cannot show the trial court disregarded the malice exception in error.  (See *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 156.)  As discussed further below, this is not the only instance in which plaintiffs fail to identify evidence of an intent by Dr. Fontaine or Dr. Mueller to harass Operstein on the basis of sex or national origin or to retaliate against her.

### iv.      FEHA causes of action
### 1.      Discrimination

FEHA prohibits discrimination against an employee "because of" one or more various protected characteristics, including national origin, age, and gender.  (Gov. Code, § 12940, subd. (a).)  To state a prima facie case for prohibited discrimination under FEHA, "a plaintiff must show that:  '(1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, . . . and (4) some other circumstance suggests discriminatory motive.' [Citation.]  Thus, a plaintiff must establish a causal nexus between the adverse employment action and his protected characteristic."  (*Martin v. Board of Trustees of California State University* (2023) 97 Cal.App.5th 149, 161-162.)

"While the plaintiff's prima facie burden is 'not onerous' [citation], he must at least show ' "actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a [prohibited] discriminatory criterion . . . .' " ' "  (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 355 (*Guz*).)  A "plaintiff's subjective beliefs in an employment discrimination case do not create a [triable issue]; nor do uncorroborated and self-serving

declarations." (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 433.) Moreover, the plaintiff must present "nonspeculative evidence [of] an actual causal link between prohibited motivation and [the adverse employment action]." (*Id.* at pp. 433-434.)

Here, plaintiffs fail to identify evidence sufficient to support a finding that the adverse employment actions Operstein claimed to have suffered were connected to her age, gender, ethnicity, or national origin—the protected characteristics she claims to have motivated them.

Plaintiffs first argue discriminatory intent can be inferred from the fact that Operstein's position was later filled by a Burmese male. That is not sufficient evidence to support a finding of causation under the circumstances. Defendant elected not to renew Operstein's contract in 2015. The Burmese man was hired three years later, in 2018. The greater the time between the adverse employment action and the hiring of the replacement employee, the weaker the inference that may be drawn. Here, we find the time between Operstein's terminal appointment and the hiring of the Burmese linguistics professor too great to support an inference that defendant terminated Operstein on the basis of any protected status. (See, e.g., *Payne v. Norwest Corp.* (9th Cir. 1999) 185 F.3d 1068, 1074 [two-year delay between termination and replacement "eliminated any inference of age or sex discrimination"].)

Plaintiffs next argue discriminatory intent may be inferred from evidence that an employer's explanation for its adverse action is " 'false or unworthy of credence,' " even without evidence of the employer's actual motive. This is not the law in California. The very case plaintiffs cite, *Slatkin v. University of Redlands*

(2001) 88 Cal.App.4th 1147, 1157 rejected the proposition "that evidence of pretext is tantamount to evidence of discrimination." Quoting our Supreme Court's decision in *Guz*, *supra*, 24 Cal.4th at pages 360 to 361, the *Slatkin* court explained: "even if pretext is shown, 'an inference of intentional discrimination cannot be drawn solely from evidence, if any, that the company lied about its reasons. The pertinent statutes do not prohibit lying, they prohibit discrimination. [Citation.] Proof that the employer's proffered reasons are unworthy of credence may "considerably assist" a circumstantial case of discrimination, because it suggests the employer had cause to hide its true reasons. [Citation.] Still, there must be evidence supporting a rational inference that *intentional discrimination, on grounds prohibited by the statute, was the true cause* of the employer's actions.' " (*Slatkin*, at p. 1157.)

Plaintiffs fail to provide evidence that defendant's stated reasons for terminating Operstein were pretextual. Ignoring the issues pertaining to her lack of collegiality, plaintiffs argue it was "nonsensical" Operstein was denied tenure and promotion for failing to adhere to the word limit in her self-assessment because "[o]ther faculty at her department of different protected statuses who exceeded the 1,000 words were granted tenure and promotion." But their purported factual citation for this contention is to Operstein's "expert" report on the RTP policies at CSUF, which the trial court did not err in excluding. Plaintiffs also argue defendant's explanation that Operstein had shown insufficient process towards tenure was pretextual because she had already completed and exceeded all tenure requirements. To support this, Operstein cites to her own opinion, this time in testimony, that "each and every ground on the denial to me of

28

reappointment, early tenure and early promotion was without merit." Such self-serving assertions of Operstein's subjective belief, even if not excluded by the court's evidentiary rulings, do not demonstrate pretext.

Plaintiffs next argue that defendant's discriminatory intent is evident from its official recruitment and hiring policy. Plaintiffs unhelpfully provide citations only to Operstein's testimony about this policy rather than the policy itself. Her testimony refers to "UPS 210.001," entitled "Recruitment and Appointment of Tenure Track Faculty," as being the source of the discriminatory policy. According to Operstein's testimony, the policy stated " 'ideally applicant pool demographics will be aligned with national pools of appropriate and qualified candidates and should also be evaluated in relation to the student population of the department."

Without any guidance from plaintiffs, we located in the record the 2018 version of UPS 210.001. The stated purpose of the policy "is to appoint a high quality and diverse faculty utilizing an effective, nondiscriminatory recruitment process." As part of this, it encourages what Operstein noted: that applicant pool demographics should "align[] with national pools of appropriately qualified candidates and should also be evaluated in relation to the student population of the department." Plaintiffs' reading of this policy as compelling a precisely engineered faculty demographic is unsupported by its text. In any event, whatever the policy's import, plaintiffs fail to show its relevance to Operstein's termination. UPS 210.001 governed recruitment and appointments beginning in 2014. Having been hired earlier, Operstein was never subject to this policy.

Plaintiffs next assert they have statistical evidence of

defendant's discrimination.  But again, the "factual" citations are to Operstein's disallowed "expert" report.  Moreover, the one statistic—that "over 99% of CSU tenure-track faculty system-wide were granted tenure or reappointment"—tells us nothing about discriminatory motive.  Plaintiffs also note no faculty of "foreign national origin" had been granted tenure in the linguistics department in the past decade.  Again, divorced from any other context, it is impossible to ascribe any discriminatory motive to this fact.  This is especially true when Operstein simultaneously claims her "replacement" by a person of foreign national origin shows discrimination.

Plaintiffs next argue comparative evidence of performance and performance evaluation shows discriminatory intent.  Once again, plaintiffs' citations to the purported evidence are almost entirely to Operstein's excluded expert report.  The few stray citations they make to Operstein's testimony as a percipient witness fail to establish any reasonable basis for inferring unlawful discrimination.

Plaintiffs finally argue defendant's discriminatory motive can be shown by virtue of their disregard for Operstein's performance.  The evidence they cite establishes only that she made defendant aware of her performance and was denied reappointment.  This does not suggest defendant ignored her performance in reaching the decision it did.

### 2.	Retaliation

Plaintiffs' discussion of Operstein's retaliation cause of action is too cursory to show error.  Plaintiffs fail to so much as describe the prima facie case necessary to avoid nonsuit, much less show that each element was satisfied.

Government Code section 12940, subdivision (h), prohibits

30

retaliation against an employee for opposing practices prohibited under FEHA, including by filing a complaint, or testifying or assisting in a FEHA proceeding. " '[T]o establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a "protected activity," (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action.' [Citation.] 'It is well established that a retaliation claim may be brought by an employee who has complained of or opposed conduct that the employee reasonably believes to be discriminatory, even when a court later determines the conduct was not actually prohibited by the FEHA.' [Citations.] ' "[A] plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented." ' " (*Vines v. O'Reilly Auto Enterprises, LLC* (2022) 74 Cal.App.5th 174, 185-186.)

Plaintiffs identify no evidence that Operstein reasonably believed any of the practices she complained of were prohibited by FEHA. They recite that Operstein was subject to sexual harassment by Dr. Mueller. The purported harassment was a demand by Dr. Mueller that Operstein go to the CSUF campus— her place of work—to meet with him, and his negative reaction to her refusal. There is nothing to suggest that his demand for an in-person meeting with Operstein or reaction to her refusal related to her gender in any way.

Plaintiffs next recite that Operstein wrote a letter to Dr. Cruz complaining that his denial of early promotion and tenure to her in 2014 was discriminatory. According to

Operstein's testimony, this claim was based on her subjective assessment that Dr. Mueller had been "promoted to a much higher rank and salary of full professor on an inferior scholarly record [to hers] by the same decisionmaker in 2013." This subjective and self-serving claim alone, without any objective basis to assess it, cannot support an inference that Operstein's complaint of discrimination was reasonable.

Plaintiffs finally assert Operstein filed EEOC discrimination complaints in March and May 2015, shortly before she received her terminal year appointment. Again, plaintiffs do nothing to establish a basis on which to conclude her complaints were reasonable.

### 3. Harassment

As with Operstein's retaliation cause of action, plaintiffs fail to discuss the legal framework applicable to her harassment cause of action. Their conclusory factual assertions fail to show error.

Government Code section 12940, subdivision (j), prohibits harassment of an employee because of any protected characteristic. "To establish a prima facie case of unlawful harassment under FEHA, a plaintiff must show '(1) he was a member of a protected class; (2) he was subjected to unwelcome . . . harassment; (3) the harassment was based on [the plaintiff's membership in an enumerated class]; (4) the harassment unreasonably interfered with his work performance by creating an intimidating, hostile, or offensive work environment; and (5) [the defendant] is liable for the harassment.' " (*Martin v. Board of Trustees of California State University* (2023) 97 Cal.App.5th 149, 170.)

Here, plaintiffs contend without evidentiary support that

Operstein was "systematically harassed by age, sex, national origin, and race/ethnicity" during "the whole period of her employment with defendant." We scoured the bare record citations they offered in support of this claim, including one spanning 69 pages of trial transcript, and found just one attempt to show a causal nexus between the alleged harassment and one of Operstein's protected characteristics. Operstein testified that, at a meeting in May 2013, Dr. Fontaine corrected Operstein's pronunciation of the name of a dean at CSUF. Operstein perceived this isolated incident during her five years of employment as evidence of national origin bias. No reasonable juror could.

The only other facts plaintiffs offer to connect a protected characteristic to the harassment Operstein allegedly suffered were that a man—Dr. Mueller—treated Operstein in ways she did not like. Again, nothing in the treatment suggests the alleged treatment was based on Operstein's gender.

#### 4. Failure to prevent harassment

FEHA subjects employers to liability for failing to take all reasonable steps necessary to prevent unlawful discrimination and harassment. (Gov. Code, § 12940, subd. (k); *Dickson v. Burke Williams, Inc.* (2015) 234 Cal.App.4th 1307, 1317.) In the absence of harassment made unlawful under FEHA, there can be no liability for failure to prevent harassment under section 12940, subdivision (k). (*Dickson*, at p. 1317 ["It would be anomalous to provide a remedy for failure to prevent acts that are not 'unlawful' under the FEHA."].)

### v. Ross's loss of consortium claim

" 'A cause of action for loss of consortium is, by its nature, dependent on the existence of a cause of action for tortious injury

33

to a spouse.'" (*LeFiell Manufacturing Co. v. Superior Court* (2012) 55 Cal.4th 275, 285.)  Because the trial court properly granted defendant's motion for nonsuit as to all of Operstein's causes of action, nonsuit was also proper as to Ross's cause of action for loss of consortium.

## 6.     Denial of Request to Reopen Case

Plaintiffs claim error in the trial court's denial of their request to reopen the record in response to defendant's motion for nonsuit.  Plaintiffs assert that reopening under these circumstances is a matter of right, such that the court's denial is reversible error per se.  Plaintiffs are incorrect.  "Such an error is waived . . . if the plaintiff fails to specify what additional evidence would be presented or how the additional evidence would cure the defects in the case." (*Consolidated World Investments, Inc. v. Lido Preferred Ltd*. (1992) 9 Cal.App.4th 373, 382.)  Plaintiffs do not dispute that they failed to do so here.

## 7.     Due Process

We last address plaintiffs' claim that the trial judge denied them due process in his conduct of the trial.  Many of plaintiffs' contentions are duplicative of those underlying other aspects of their appeal, including evidentiary rulings and the termination of proceedings without an opportunity for Ross to present his cause of action for loss of consortium.  We disregard those issues, having already resolved them, above.

What remain are complaints about how the trial judge managed the proceedings, particularly as pertains to Operstein's time to present her case.  Plaintiffs offer no authority to support their contentions that the court's trial management decisions deprived them of the opportunity to be fully and fairly heard.

"A trial court has the inherent authority and responsibility

34

to fairly and efficiently administer the judicial proceedings before it.  [Citations.]  This authority includes the power to supervise proceedings for the orderly conduct of the court's business and to guard against inept procedures and unnecessary indulgences that tend to delay the conduct of its proceedings."  (*California Crane School, Inc. v. National Com. for Certification of Crane Operators* (2014) 226 Cal.App.4th 12, 22; see also Code Civ. Proc., § 128, subd. (a)(3) [every court has the power "[t]o provide for the orderly conduct of proceedings before it"].)

Our review of the record shows the trial court exercising that authority within its permissible discretion.  Contrary to plaintiffs' narrative, the court granted Operstein considerable time and leeway in presenting her case, while offering constructive suggestions about how she might use her time more efficiently.  Operstein testified for five court days, often haltingly and repetitiously.  The only other witness she called was Ross.  After he was dismissed, Operstein told the court she had no further witnesses.  Due process did not require the trial court to afford Operstein unlimited time to present her case, nor does it create a do-over right for litigants who use their reasonable allotment ineffectually.

Plaintiffs fail to show they were denied due process.

## DISPOSITION

We affirm the judgment and orders of the trial court.  Costs are awarded to defendant.


GRIMES, J.

WE CONCUR:


STRATTON, P. J.          VIRAMONTES, J.